DETERMINED IN THE

# SUPREME COURT

OF

# WASHINGTON

[No. 16353. *En Banc.* May 26, 1921.]

THE STATE OF WASHINGTON, *on the Relation of William M. Short et al., Plaintiff,* v. J. GRANT HINKLE, *as Secretary of State, Respondent.*[1]

CONSTITUTIONAL LAW (39)—STATUTES (2-3)—LEGISLATIVE POWERS —ACTS—TIME OF TAKING EFFECT—DETERMINATION OF EMERGENCY. The Administrative Code (Laws 1921, p. 9, ch. 7) is not subject to referendum under Art. 2, § 1, of the state constitution as amended; in view of the emergency clause which recites that the revenues of the state are insufficient to support the state government and its existing public institutions and that it is necessary that the existing administrative agencies of the state government be consolidated and coordinated in order to bring the cost of supporting the state government and its existing institutions within the possible revenue of the state; which is a statement of fact, which the court cannot, from its judicial knowledge, say does not exist.

SAME. In a mandamus proceeding to compel the secretary of state to submit to referendum a legislative act reciting an emergency for its taking effect immediately, the court is without power to grant the writ, in view of the presumption of verity attaching to the legislative declaration of emergency, unless it can say from judicial knowledge that a patent contradiction exists upon the face of the enactment sufficient in law or in reason to justify the court's denial of the declaration of emergency.

SAME. A legislative act is properly one for the support of the government, if its purpose is to give the government and its existing public institutions the greatest benefit from the revenues which are actually received, and also to protect the resources of the state from which such revenues are derived.

[1] Reported in 198 Pac. 535.

SAME. Where a legislative enactment is composed of many separate sections, some of which the court in the exercise of its judicial knowledge must know to be emergent, a mandamus proceeding to compel the secretary of state to submit the entire act to popular vote under the referendum provisions of the state constitution must fail.

HOLCOMB, TOLMAN, MAIN, and MITCHELL, JJ., dissent.

Application filed in the supreme court February 14, 1921, for a writ of mandamus to compel the secretary of state to receive and file a proposal for the referendum of the administrative code. Denied.

*Geo. H. Rummens, Tracy E. Griffin,* and *P. M. Troy,* for relators.

*The Attorney General,* for respondent.

MACKINTOSH, J.—This is an original proceeding in mandamus to compel the secretary of state to receive and file the proposal and affidavits of the relators for the referendum of Laws of 1921, ch. 7, p. 12, being an act entitled "An Act relating to, and to promote efficiency, order and economy in, the administration of the government of the state, prescribing the powers and duties of certain officers and departments, defining offenses and fixing penalties, abolishing certain offices, and repealing conflicting acts and parts of acts," and commonly known as the administrative code.

Chapter 7 consists of 138 sections, the final section being:

"Whereas the revenues of the state are insufficient to support the state government and its existing public institutions as at present organized, and whereas it is necessary that the existing administrative agencies of the state government be consolidated and coordinated in order to bring the cost of supporting the state government and its existing institutions within the possible revenues of the state, therefore this act is necessary for the support of the state government and its

existing public institutions, and shall take effect immediately.'' Laws of 1921, p. 69, § 138.

Article 2, § 1, of the state constitution is as follows:

''The legislative authority of the State of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the State of Washington, but the people reserve to themselves the power to propose bills, laws and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act or law passed by the legislature.   .   .   .

''The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions, either by petition signed by the required percentage of the legal voters, or by the legislature as other bills are enacted.  Six per centum, but in no other case more than thirty thousand, of the legal voters shall be required to sign and make a valid referendum petition.

''No act, law, or bill, subject to referendum, shall take effect until ninety days after the adjournment of the session at which it was enacted.  No act, law or bill approved by a majority of the electors voting thereon shall be amended or repealed by the legislature within a period of two years following such enactment.  But such enactment may be amended or repealed at any general, regular or special election by direct vote of the people thereon.''

The respondent declined to accept and file the proposal and affidavits for the reason that § 138 does not permit of the act being referred.  The relators' position is that § 138 is of no effect for the reason that the act is not emergent.

The relators take their stand flatfootedly upon our decision in the case of *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 Pac. 11, that being a case which involved an act of the legislature passed in 1915 (Laws of 1915, ch. 6, p. 19) in relation to the board of state land commissioners, the act being an amendment of the prior law (Laws of 1909, p. 757, ch. 223). Under the law of 1909 the board was made up of the commissioner of public lands, the state fire warden, and the members of the state board of tax commissioners. The act of 1915 merely substituted for the state fire warden and the board of tax commissioners the secretary of state and the state treasurer, and to this amending act was added a section which stated that the act was necessary "for the immediate preservation of the public peace and safety and the support of the state government and shall take effect immediately." This court, in passing upon this emergency clause, held that an emergency clause attached to an act was subject to review by the courts, and that the clause would be held unconstitutional where the act, on its face, shows that the declaration is false, but that if, from an examination of the act, it be doubtful as to whether an emergency exists in fact, that the question of emergency would be treated as a legislative question, and the act would be upheld. The court there further decided that, by reason of the fact that there were being merely substituted two officers on a board in the place of other state officers, that the court could determine, from its judicial knowledge, that there was no emergency, and that the final clause of the act was inoperative.

The alpha and omega of the relators' argument is that ch. 7, of the Laws of 1921, p. 12, makes no more change in the theretofore existing plan of state government than did the act of 1915 in relation to the composition of the board of state land commissioners. It is

unnecessary to review the reasons assigned by the majority and minority opinions in the *Brislawn* case, and it is unnecessary to determine whether the *Brislawn* case was properly or improperly decided. It is sufficient to take that decision as it appears in the books and apply to it the facts in the instant case, facts obtained by an examination of Laws of 1921, p. 12, ch. 7, and not assertions based upon only a casual reading thereof. The fallacy of relators' position lies in the unfounded premise, i. e., that ch. 7 is "nothing more than 'a broad, comprehensive scheme for transferring the duties now performed by various state officers and subordinates under the present form and plan of state government to other officers and departments created by the act." Grant the premise, and under the *Brislawn* case relators' position may be correct, but the premise is found to be unwarranted upon a careful and exact analysis and understanding of the act. The act says that the revenues are insufficient to support the state government in its then existing form, and that in order for the state, as an institution, to continue to function its expenditures must be so reduced as to fall within the possible revenue, and to effect this purpose the act abolishes many offices, boards and commissioners, provides against the duplication of duties and responsibilities in administration, coordinates the operation of the business of the state, classifies employees, provides for expenditures in cases of emergency, authorizes the exchange between state institutions of supplies, provides a cost accounting system, sustains building programs, and authorizes the preparation of estimates for appropriations. Without going into the act section by section it, in general, provides a more efficient method of carrying on the state government. The court is not concerned with whether—for the reason that it cannot know—the results anticipated by the new

plan will be achieved. Under the *Brislawn* decision, the court can only hold § 138 invalid, if from its knowledge, which it possesses as a court, it can say that no necessity exists for such a change in the method of conducting the state government in the face of the legislative declaration that public funds were not sufficient to uphold the state government under the prior existing plan.

The legislature possessed the opportunity (and is conclusively presumed to have availed itself of that opportunity) to know the facts and has declared that a precarious financial condition prevails. We are asked to say that the solemn statement of the legislature is false, and to say so, not because we are possessed of any knowledge upon the subject, but because we are ignorant upon it. We can take no testimony; we have no machinery with which to gather the facts, which the legislature is presumed to be possessed of, but, totally in the dark, we are asked to substitute our personal prejudices, predilections and preconceptions for the presumably enlightened judgment of those deputed by the constitution of the state to inquire into and determine these factual problems. It is only when the court, following the *Brislawn* case, can say, from its judicial knowledge, that a patent contradiction exists upon the face of a legislative enactment, that, in law or in reason, it can deny the legislative declaration of emergency. As Judge Parker says in the case of *State ex rel. Reclamation Board v. Clausen,* 110 Wash. 525, 188 Pac. 538:

"It may well be doubted that there has ever come to the American courts any more vexatious question than that of determining whether or not a particular purpose for which public funds were sought to be raised by taxation and expended is a public purpose, when the particular purpose in question lay within that twilight

zone wherein the minds may reasonably differ as to such purpose being a public one; the bounds of which zone are ever changing with the passing of time, and within which new problems of public welfare always first appear. That such a question, when arising in the courts, has proven so vexatious is, we apprehend, because of its inherent nature, in that, in its last analysis, it is not one of exclusive legal logic, but is one more or less of policy and wisdom, properly determinable in the light of public welfare, present and future, in a broad sense; and hence is not a pure judicial law question, except in those cases clearly outside of the twilight zone we have alluded to. . . .

"Plainly, since a correct solution of our present problem, because of its inherent nature, calls for the consideration of something more than pure legal principles, suggests that we exercise a great degree of caution to the end that we shall not usurp powers which do not constitutionally belong to us. This court has adhered steadfastly to the general rule, in common with other courts of our country, that a statute cannot be declared unconstitutional unless it clearly so appears. Is not this rule of peculiar force in its application to the question of whether or not a legislative act authorizing the levy of a tax and the expenditure of public moneys so raised is for a public purpose? We are decidedly of the opinion that it is."

When the court speaks of the determination of the validity of a section such as 138 being a judicial question, it is meant that courts will inquire into the fact as to whether a necessity exists, an inquiry necessarily based upon proof, but proof, limited by law, to so-called judicial knowledge. But to resolve the immediate problem, obviously its intricate and complicated nature requires the exertion and application of an amount of expert knowledge, experience and judgment, necessarily without the scope of the restricted doctrine of judicial knowledge, and, as we have intimated, properly commanded only by the legislature. In its nature, the at-

tenuated theory of judicial knowledge, in the presence of so considerable a mass of fact as the administrative code, cannot afford proof sufficient to overcome the declaration of the legislature, even though that declaration were naked and unsupported by the presumption of verity. To apply judicial knowledge to the resolution of peculiarly factual problems would "amount to turning the supreme court into an irresponsible House of Lords," as Theodore Roosevelt said, in referring to the *Bakeshop* cases, "a position which the people of the United States would never stand."

Relators speciously argue that the declaration of the legislature that some change in the method of administration is necessary in order to bring the cost of operating the state government within its revenues is, *ipso facto,* false, for the reason that the state always possesses the power of taxing in any amount that is necessary to perpetuate any form of administration which may be in existence. This is an enamelled argument which might be brightly attractive to those fortunate citizens who contribute nothing by way of taxes to the support of the state. Although the state possesses unlimited power of taxation such unlimited power does not produce unlimited revenue and a point is attainable—and the legislature declares it is already reached—where additional taxation produces nothing but defaulted realty and personalty in the hands of the collector, and when the levy of additional taxes creates burdens which parch the source of revenue, the levies tend to destroy rather than support the state government. It is certain, as was said in the case of *State v. Pitney,* 79 Wash. 608, 140 Pac. 918, Ann. Cas. 1916 A 209:

"If a state of facts can reasonably be presumed to exist which would justify the legislation, the court must presume that it did exist and that the law was passed

for that reason. If no state of circumstances could exist to justify the statute, then it may be declared void because in excess of the legislative power.''

In *State ex rel. Blakeslee v. Clausen*, 85 Wash. 260, 148 Pac. 28, Ann. Cas. 1916 B 810, the court said, in reference to ''support'':

''The intent and purpose of the people, as gathered from the words of the constitution and the circumstances attending the adoption of the seventh amendment, impels the holding that the people intended to use the word 'support' in its fullest sense. When so considered 'support' includes appropriations for current expenses, maintenance, upkeep, continuation of existing functions, as well as appropriations for such new buildings and conveniences as may be necessary to meet the needs and requirements of the state in relation to its existing institutions.

''In Webster's New International Dictionary, the word 'support' is given the following definitions: 'To furnish with funds or means for maintenance; to maintain; to provide for, to enable to continue; to carry on.'

''In the absence of an express reservation, it would be a usurpation on the part of any court to say that an appropriation directed to the maintenance of the existing activities of the state is subject to the referendum. The first right of government is the right of self-preservation, and to say that the people intended, in the absence of an express reservation, to allow the government or its institutions to be crippled or embarrassed in any way would be to say that the people intended that the government could not sustain itself through the mediumship of the ordinary and recognized methods of legislation.''

See, also, *State ex rel. Anderson v. Howell*, 106 Wash. 541, 181 Pac. 37; *State ex rel. Case v. Howell*, 85 Wash. 281, 147 Pac. 1162.

If the purpose of the act is to give the government and its existing public institutions the greatest benefit

from the revenues which were actually received, and also to protect the resources of the state from which those revenues derive, then the act is properly one for the support of the government.

There is another reason why the relators must fail in their attempt to refer this act, and that is that they are seeking reference of the entire act, and if there is any section or portion of it of which the court can say there is an emergency their proceedings must fall. If it should be conceded that as to certain sections or portions of the act the court could say, from its judicial knowledge, that the changes made were not necessary for the support of the state government and its existing institutions, yet the relators are making a general attack and are not seeking to refer those sections only which the court might judicially declare not to be emergent. There are, however, many separate sections which the court in the exercise of its judicial knowledge must know are emergent, and, as we have already indicated, from our judicial knowledge we cannot say that the act as a whole is not emergent. Those sections referring to the protection of agriculture, game and fish are, from their very nature, concerned with things necessary for the support of the state and its existing institutions. Those sections dealing with labor and industry show a necessity exists to overcome the conflict of jurisdiction and inefficiency of the existing form of administration of which the court has judicial knowledge from the many cases coming before it involving these questions. One instance of this conflict is the difference existing between the commissioner of labor and the state safety board, to which this court has devoted its attention. *State ex rel. Younger v. Clausen,* 111 Wash. 241, 190 Pac. 324. Instances might be multiplied of where the act in itself contains evidence of the

necessity which the judicial knowledge of this court confirms.

To summarize then our conclusions: Taking the *Brislawn* case as the law, we find that in that case the court had before it a scheme which merely changed the personnel of one of the state commissions and between that change of membership of a minor board and the support of the state government there was no natural connection. In the act before us there are certain facts which, if they were considered by themselves, are similar to the facts in the *Brislawn* case, but these facts are only a part of an entire plan proposed to reorganize the administration of the state's business, upon what, the legislature deems, are businesslike principles. This court is not called on to consider the act section by section, disregarding the act as a whole, especially since the relators are not making specific attack upon any special sections but are attacking the act as a whole. Moreover this case differs from the *Brislawn* case in that in the *Brislawn* case the legislature merely stated that a necessity existed, and this was but a conclusion by the legislature that it was engaged in a constitutional proceeding. This court refused that legislative dictum in the light of the facts of which the court had judicial knowledge. In the act before us, however, the legislature makes a specific statement of fact that the revenues of the state are not sufficient to support the state government or its existing institutions as they were then organized, and that it was necessary to coordinate the affairs of the state, "in order to bring the cost of supporting the state government and its existing institutions within the possible revenues of the state." This is a declaration of fact and unless the court from its judicial knowledge can say this fact does not exist it must be taken as true. *State ex rel. Govan*

*v. Clausen,* 108 Wash. 133, 183 Pac. 115; *State ex rel. Lister v. Clausen,* 108 Wash. 146, 183 Pac. 120. For the reasons stated, the writ is denied.

Parker, C. J., Fullerton, Bridges, and Mount, JJ., concur.

Holcomb, J. (dissenting)—"All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." Constitution of Washington, art. 1, § 1.

Section 32 of the same article declares:

"A frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government."

It seems that the majority have forgotten those positive declarations of our fundamental law. It seems, also, that they are imbued with the idea that there are some instances in which the courts, may not inquire into the validity of a legislative act under the restrictions of the constitution. Our primary obligation is to the constitution.

"In monarchical governments, the independence of the judiciary is essential to guard the rights of the subject from the injustice of the crown; but in republics it is equally salutary, in protecting the constitution and laws from the encroachments and tyranny of faction. . . . Nor is an independent judiciary less useful as a check upon the legislative power, which is sometimes disposed, from the force of party, or the temptations of interest, to make a sacrifice of constitutional rights; and it is a wise and necessary principle of our government, . . . that legislative acts are subject to the severe scrutiny and impartial interpretation of the courts of justice, who are bound to regard the constitution as the paramount law, and the highest evidence of the will of the people." 1 Kent, Commentaries, 294, 295.

"This, then, is the office of a written (free) constitution: to delegate to various public functionaries such of the powers of government as the people do not intend to exercise for themselves; to classify these powers according to their nature, and to commit them to separate agents; to provide for the choice of these agents by the people; to ascertain, limit and define the extent of the authority thus delegated; and to reserve to the people their sovereignty over all things not expressly committed to their representatives." Hurlbut on Human Rights and their Political Guaranties.

"It is idle to say the authority of each branch is defined and limited in the constitution, if there be not an independent power able and willing to enforce the limitations. Experience proves that it is thoughtlessly but habitually violated; and the sacrifice of individual rights is too remotely connected with the objects and contests of the masses to attract their attention.

"From its every position, it is apparent that the conservative power is lodged with the judiciary, which, in the exercise of its undoubted right, is bound to meet every emergency; else causes would be decided not only by the legislature, but, sometimes, without hearing or evidence." Gibson, Chief Justice, in *De Chastellux v. Fairchild*, 15 Pa. St. 18.

"Without the limitations and restraints usually found in written constitutions the government could have no elements of permanence and durability; and the distribution of its powers and the vesting their exercise in separate departments would be an idle ceremony." *People v. Draper*, 15 N. Y. 532, Brown, J.

"It cannot be denied that the one great object of written constitutions is to keep the departments of government as distinct as possible; and for this purpose to impose restraints designed to have that effect. And it is equally true that there is no department on which it is more necessary to impose restraints than upon the legislature. The tendency of things is almost always to augment the power of that department  .  .  ."

"The constitution being the supreme law it follows of course that every act of the legislature contrary to that law must be void. But who shall decide this ques-

tion? Shall the legislature itself decide it? If so, then the constitution ceases to be a legal and becomes only a moral restraint upon the legislature. If they and they only are to judge whether their acts be conformable to the constitution, then the constitution is admonitory or advisory only; not legally binding; because, if the construction of it rest wholly with them, their discretion in particular cases may be in favor of very erroneous and dangerous constructions. Hence the courts of law, necessarily, when the occasion arises, must decide upon the validity of particular acts. . . . .

"Without this check, no certain limitations could exist on the exercise of legislative power." 3 Daniel Webster, Independence of the Judiciary, Works, p. 29.

During the last forty years of the nineteenth century and the first decade of the twentieth, popular unrest and distrust of legislatures resulted, in numerous states, in a return to the primitive system of direct legislation, modified by modern systems of election. The result in this state was the adoption in 1912 of the seventh amendment to the constitution, which is, in substance, set forth in the majority opinion. By plain and simple, apt and certain words, it withdrew from the legislature the power to finally enact legislation, with certain clear exceptions, and reserved them to the people.

The emergency declared in the act under consideration is that, it is "necessary for the support of the state government and its existing institutions."

That it may be a better system of administration and operation of the state's activities, may, for the purpose of this argument, be readily conceded. With the desirability or results of such a system, or the policy or the expediency of it, courts have no concern. We are here to declare the law, not to defend, or assail policies. That this system is immediately necessary for the support of the state and its existing institutions is plainly,

utterly and emphatically fallacious. This is proven by the fact that for thirty-two years the state existed and the successive and cumulative wisdom of sixteen legislatures evolved the system of administration heretofore existing. It remained for the seventeenth legislature to suddenly enact, almost without debate, or deliberation, a revolutionary act, completely changing the existing system of administration, transferring the duties of a number of bureaus, commissions and officials to ten new, highly paid officials, with numerous highly paid assistants; and it is declared that this new and extremely revolutionary system is so immediately necessary that an emergency exists, and that the act cannot wait the lapse of ninety days from the adjournment of the session at which it was enacted.

The proposition is preposterous. There is no declaration that unless put into effect before June 8, 1921, the state would become insolvent, or that its several agencies transformed and transferred to the new would cease to function under the old system. It may be noted that the same legislature that declared this system to be necessary, "in order to bring the cost of supporting the state government and its existing institutions within the possible revenues of the state," appropriated the total sum of $10,637,289.88 from the general fund for the support and maintenance of the state and its existing institutions for the biennium ending in 1923, as against a total appropriation by the legislature of 1919, for the support of the state and its then existing institutions from the general fund of $10,561,000.42. There has never been a more supreme example of an act of the legislature intended to be reserved by the seventh amendment for the right of referendum to the people. It is an act of the utmost importance to the people of the state. It is a much more obvious legislative evasion

of the seventh amendment that that under consideration in the case of *State ex rel. Brislawn v. Meath*, 84 Wash. 302, 147 Pac. 11, in which our present learned chief justice concurred with the majority in deciding that there could not be any immediate emergency as declared by the legislature. And that case was right, and the attempt to distinguish this case from it by the majority is a vain attempt at a distinction without a difference. That case was thoroughly considered, unanswerably reasoned, and its determination was the only logical result under the seventh amendment. Otherwise that amendment, as to the reserve power of the people to have measures referred for their acceptance or rejection, is merely solemn and empty phrasemaking, and the legislature is at liberty to evade it, by a mere *ipse dixit* whenever it is so inclined.

The legislature is very powerful, but not all powerful. It is not like the British parliament, or other parliamentary bodies, which exercise sovereign authority, and may even change the constitution at any time by declaring the parliamentary will to that effect. Our constitutions consist entirely of commands to, and limitations and restraints upon, the several governmental agencies. They were created for the protection of the minority against the tyranny of the majority.

"In America after a constitutional question has been passed upon by the legislature, there is generally a right of appeal to the courts when it is attempted to put the will of the legislature in force. For the will of the people, as declared in the constitution, is the final law; and the will of the legislature is law only when it is in harmony with, or at least is not opposed to, that controlling instrument which governs the legislative body equally with the private citizen." Cooley, Constitutional Limitations (7th ed.), p. 6.

"While every possible presumption is to be indulged in favor of the validity of the statute, . . . the

courts must obey the constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed." *Mugler v. Kansas,* 123 U. S. 623.

Courts are both cautious and reluctant to override a law duly enacted by the legislature; and that caution and that reluctance are to be applauded. We have gone as far as the courts of any state and as far as judicial ingenuity and judicial oaths could possibly go in upholding legislation of doubtful constitutional validity, upon the theory that every possible presumption is to be indulged in favor of the validity of the statute. The rule of reason should be applied to every case.

"To what purpose," said the great Chief Justice, John Marshall, in *Marbury v. Madison,* 1 Cranch (U. S.) 49, "are powers limited, and to what purpose is that limitation committed to writing; if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the person on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation. It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.

"Between these alternatives there is no middle ground. The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it. . . .

" Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation and consequently the theory of every such government must be, that an act of the legislature repugnant to the constitution is void."

As if in answer to the oral argument made here by the *Attorney General,* and the idea that seems to prevail in the minds of the majority, that the constitution does not specify who shall declare the conditions to support which the constitutionality of the act must be determined, exist, and that the seventh amendment does not so specify, that the legislature is therefore the exclusive judge of the existence of these conditions, the great chief justice in the case above quoted, further said:

"If any act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts and oblige them to give it effect?
"It is emphatically the province and duty of the judicial department to say what the law is.  .  .  .
"If then, the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply."

In this case we have a legislative declaration which is manifestly made for the purpose of preventing any referendum to the people upon the act, otherwise it would not be in the act. It was enacted for that sole purpose, and the majority of this court say that the courts are bound by that declaration and cannot inquire beyond its enactment.

The act before us states as its purpose the consolidation of numerous departments, commissions, bureaus and officials into fewer departments for the purpose of co-ordinating their activities, and securing greater efficiency and greater economy, and transfers the duties of the boards, bureaus, commissions and officers that are abolished, to the new departments.

In 1915 the legislature consolidated the duties of several commissions and bureaus and transferred certain duties to one board, called the board of state land com-

missioners, and declared that the act was "necessary for the immediate preservation of the public peace, and safety, and the support of the state government, and shall take effect immediately." The act was by no means as comprehensive as the present act, but it was brought before this court to contest the validity of the emergency clause. In that case Judge Chadwick, speaking for the court, said:

"Where there is a declaration in the constitution that no law shall take effect unless in a case of emergency to be declared by the legislature, it may be truthfully said that the general rule is that a court will not review the declaration of the legislature; but where the people have put upon the legislature a limitation in the way of a specific definition of its power, and an elimination of acts of a certain character, the rule is that the declaration of an emergency must conform to the constitutional requirement. . . .

"At the general election held in November, 1912, the people of the state adopted the initiative and referendum amendment to the constitution. By this amendment, it was provided that no law or bill subject to the referendum shall take effect until ninety days after the adjournment of the legislature at which it was enacted, and that all laws shall be subject to referendum except such as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions. . . .

"It is the contention of the respondents that the provision for an emergency in the amendment is in no respect different from that contained in the constitution, art. 2, § 31, and that the courts are powerless to inquire into the act or discretion of the legislature; that we are governed by the same rules and by the same considerations which have moved the courts since the establishment of our government to put no judicial restraints upon legislative discretion. . . .

"The judicial aversion to a review of legislative discretion, in so far as it relates to emergency clauses, is

no more thoroughly established than the equivalent declaration that courts have power to declare laws unconstitutional. Now there is no more reason for saying that a bill is an emergency measure, when upon its face it is not, and from the very nature of its subject-matter cannot be, just because the legislature has said it is so, than there is for declaring a law to be unconstitutional when it has been passed by the legislature with the constitution and its limitations lying open before it. The sense and discretion of the legislature, as well as its power to discriminate between an act falling clearly without and one falling clearly within the constitution, should, if we are consistent, be given the same weight as a declaration that an act is emergent, but few courts have so held since *Marbury v. Madison*, 1 Cranch, (U. S.) 49, although their inconsistencies have long been apparent to the lay mind. In the one case we have said that we will inquire, in the other we have said that we will not inquire, saying meanwhile that we will indulge every presumption in favor of a law and will not declare it unconstitutional unless it is clearly violative of the constitution.

"The object of the amendment, in so far as it touches the taking effect of bills or laws, was to secure the right of review. In paragraph 'b' of the same section it is provided:

" 'The second power reserved by the people is the referendum and it may be ordered on *any* act, bill, law, or *any part* thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions.'

"If specific reservation in words of the right to subject *all* laws to the referendum were not enough, the preamble of the amendment makes it clear that the people intended to assert that the revised and amended clause of the constitution permitting emergent legislation should not be a dead letter, as was § 31, which was expressly repealed. They said:

" 'The legislative authority of the State of Washington shall be vested in the legislature, consisting of the

senate and house of representatives, which shall be called the legislature of the state of Washington, but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, *at their own option,* to approve or reject at the polls any act, item, section or part of any bill, act or law passed by the legislature.' Laws of 1911, p. 36.

"The people said to the legislature, make such laws as you will, but you may not legislate so as to take away our rights to pass upon the law you have just enacted, 'except such laws as may be necessary for the immediate preservation of the peace, health or safety, support of the state government and its existing institutions.' " *(State ex rel. Brislawn v. Meath, supra).*

After discussing the fact that under the original constitution and § 31, art. 2 thereof, the legislature had unlimited power to declare emergencies without the right of review by the people, the writer of the foregoing opinion continues:

"But here no such declaration is final, and should be given no immediate effect unless it can be fairly said that the act is necessary to preserve the health, peace or safety of the state or to support the government or its institutions."

and quotes from *Mugler v. Kansas,* 123 U. S. 623, to the effect that courts are not bound by mere forms, nor are they to be misled by mere pretenses. The opinion continues:

"The reservation in the amendment is a declaration of 'Thou shalt not', except it be for the safety or support of the state. . . . .
 . . . "power has been withheld, in so far as a withholding can be made by apt and certain words."

The opinion further says:

"The true rule is: The referendum cannot be withheld by the legislature in any case except it be where the act touches the immediate preservation of the pub-

lic peace, health, or safety, or the act is for the financial support of the government and the public institutions of the state, that is, appropriation bills. If the act be doubtful, the question of emergency will be treated as a legislative question, and the doubt resolved in favor of emergency made by the legislative body.

"Emergency, in the sense of the present constitution, does not mean expediency, convenience or best interest. There is no room for construction or speculation. The declaration is equivalent to saying that the referendum shall not be cut off in any case except in certain enumerated instances, none of which now occur. . . .

"The essence of our reasoning is not that the legislature has abused its discretion; that is really immaterial; but that the people shall have a right, if they see fit, to review its acts and place the stamp of approval or disapproval upon it."

It was there concluded:

"The real question is, Can the people, as distinguished from a representative legislative body, indulge in constructive legislation and reserve that right without interference by the legislature or the courts, except where, in certain enumerated instances, they have waived the right in order that the immediate necessities of health, peace and safety and the support of the government and our public institutions may be met by their representatives duly convened in legislative session? Section 2 of the act amending § 6605, violates the Seventh Amendment to our constitution, and is void. The act will take effect ninety days after the legislature has adjourned."

In *State ex rel. Mullen v. Howell*, 107 Wash. 167, 181 Pac. 920, involving the method of ratifying or rejecting the eighteenth amendment to the constitution of the United States, Chadwick, C. J., again writing the opinion for the court, again reviewed the reasons for the adoption of the seventh amendment to our state consti-

tution, known as the direct legislative amendment, among other things said:

"No cases have been cited, and we may confidently say that there are none holding to the rule of strict construction where the power of the whole people is in question. . . . .

"It is well known that the power of the referendum was asserted, not because the people had a willful or perverse desire to exercise the legislative function directly, but because they had become impressed with a profound conviction that the legislature had ceased to be responsive to the popular will. They endeavored to, and did—unless we attach ourselves to words and words alone, reject the idea upon which the referendum is founded, and blind ourselves to the great political movement that culminated in the seventh amendment —make reservation of the power to refer every act of the legislature with only certain enumerated exceptions. . . .

" 'The theory of our political system is that the ultimate sovereignty is in the people, from whom springs all legitimate authority'." Citing Cooley, Constitutional Limitations (6th ed.), p. 39.

And in that case one of our learned associates, Judge Mackintosh, concurred with the majority and wrote a special concurring opinion in which he said:

"By the adoption of the initiative and referendum amendments the people of this state became a part of the legislative branch of the state government, and all legislative actions, except those especially exempted, are subject to their participation. The reasons which have led up to this modern form of legislation are as set forth in Judge Chadwick's opinion and, upon both authority and reason, no curtailment of this power should now be judicially sanctioned. If the people have declared their intention to assert their authority over the legislature in acts many of which are of temporary or small importance, it was surely their intention to preserve to themselves the right of reviewing legislative action of lasting and great importance, . . .

It would be idle to say that the right of referendum could be exercised in the unimportant matters and not in the important.

"The dissenting opinion of Judge Parker indulges in altogether too narrow and restricted an interpretation of the right of referendum, and seems to be entirely out of harmony with the course of the decisions of this court upon this and kindred matters arising under laws affecting modern legislative and governmental functions. By strict adherence to dictionary definitions, this dissenting opinion crushes the spirit of the constitutional provisions under consideration, and if it were the prevailing view in this case, would mark a step backward by a court which has come to be recognized as rather liberal in its interpretation of legislation aimed at the correction of social and public evils."

And yet, we have here not merely *a step* backward, but a long march backward in the interpretation of the force and effect of the referendum clause of the seventh amendment.

The emergency declared is that the act "is necessary for the state government and its existing institutions." Apply the simplest rules of construction to this declaration of emergency and it must fall. It is not, and does not pretend to be, an act carrying an appropriation for either *existing* or *future* public institutions. It abolishes *existing* institutions and substitutes new ones.

In *State ex rel. Blakeslee v. Clausen*, 85 Wash. 260, 148 Pac. 28, we held, Judge Parker concurring, that the seventh amendment to the constitution, art. 2, § 1, subd. (b) giving the right of referendum upon all laws except such as may be necessary for the "immediate preservation of the public peace, health and safety, (and the) support of the state government and its existing public institutions" contemplates "support" as

including appropriations for current expenses, maintenance, upkeep, continuation of existing functions, as well as appropriations for such new buildings and conveniences as may be necessary for the needs and requirements of the state in relation to its *existing* institutions, but did not contemplate exemption from the referendum where the law brought the state into a new activity, or provided for a new function, so that it might be fairly said that it did not pertain to the *support* of the government *as then organized,* or to any (then) *existing institution.*

That precisely covers the situation here.

The present act *abolishes seventy existing* institutions and substitutes new ones to go into existence April 1, 1921.

Nor can it be said that it is necessary for the future support of the state government as it must be organized for the future, for the language of the constitution is that an emergent matter must be for the "support of the state government *and* its *existing* public institutions"; and by no possible straining of language can it be said that anything is *emergent unless* it is *immediate,* or approximately so, and nothing can be in immediately necessitous circumstances unless it is in existence.

Here we have the constitution with its seventh amendment before us, and an act of the legislature with a declaration of an immediate emergency, which is manifestly, as everyone knows, a mere pretense. It constitutes a positive legislative usurpation of power reserved by the people to themselves, and the majority say that the declaration is final and conclusive by the mere negation that it is non-justiciable. We have weakly vacillated from the rule adopted in the *Brislawn* case, *supra.* We have placidly closed our judicial

eyes to a legislative usurpation of rights withdrawn and reserved "by apt and certain words", to the people by the seventh amendment. We have abrogated judicial power to inquire into the validity of a legislative assertion of power; we have judicially countenanced the nullification of the seventh amendment as to the referendum—a result devoutly desired by some, but not by any considerable number of the people. It is an impotent outcome to labors in framing and adopting the amendment, withdrawing and reserving from the legislative power to fully and finally legislate in all matters except a few instances, that seemed to promise vastly more. At any rate, the law has become unsettled and its continuity broken.

The courts are the conservators of the rights guaranteed by the constitution to the people and to the individuals composing the people.

"It is requisite that the courts of justice should be able, at all times, to present a determined countenance against all licentious acts; and to deal impartially and truly, according to law, between suitors of every description, whether the cause, the question, or the party be popular or unpopular. . . . .

"Courts should be more constant and determined else the law becomes unsettled and may even become an object of scorn and derision." Kent Commentaries, p. 294.

The referendum right and power of the people may be a slow and clumsy system and may be objectionable to many. But this is a government eminently "of the people, by the people, and for the people," and they adopted this system and made it a part of the fundamental and paramount law. It is not for us to destroy it by judicial construction.

For the foregoing reasons I dissent.

The emergency clause attached to this act should be stricken under the seventh amendment of the constitu-

tion, so as to permit the act to be subject to the referendum.

TOLMAN, J., concurs with HOLCOMB, J.

MAIN and MITCHELL, JJ. (dissenting)—We concur in the conclusion arrived at in the dissenting opinion written by Judge Holcomb, for the reason that the *Brislawn* case was correctly decided and is controlling. It would serve no useful purpose to further discuss that case. The only way for an inquiring mind to determine whether the majority or the minority view of it is correct is to read that opinion and consider its application to the law here under consideration. If there is any difference between the two cases the present case is more clearly subject to the referendum than was the *Brislawn* case.