[No. 36998.   En Banc.   April 11, 1963.]

THE STATE OF WASHINGTON, *on the Relation of Homer W. Humiston, Plaintiff*, v. VICTOR A. MEYERS, *as Secretary of State, Respondent.**

*Reported in 380 P. (2d) 735.

*Stouffer, Brown & Knight*, by *W. Brown, Jr.*, for plaintiff.

*The Attorney General, Gene Godderis* and *Charles F. Murphy, Assistants*, for respondent.

*J. P. Tonkoff* (of *Tonkoff, Holst & Hopp*), *Bassett, Donaldson & Hafer*, and *Samuel B. Bassett*, amici curiae.

WEAVER, J.—This is an original application for a writ of mandamus to compel the Secretary of State to accept, file, and process documents submitted to him for the purpose of implementing a popular referendum of Laws of 1963, chapter 37 (Senate Bill No. 360), in accordance with Article 2, § 1(b) (amendment 7) of the state constitution and RCW 29.79.

Respondent refused relator's proffered documents, stating:

"Petition for referendum refused March 15, 1963 because of emergency clause contained in section 9, Enrolled Senate Bill No. 360."

Chapter 37, Laws of 1963, bears the title:

"AN ACT Relating to the maintenance and operation of certain machines or mechanical devices, salesboards, bingo equipment and cardrooms in certain governmental subdivisions; adding new sections to chapter 249, Laws of 1909 and chapter 9.47 RCW; and declaring an emergency."

The act, as passed by the legislature, adds nine new sections to the existing law. Four sections provide that ". . . it shall be lawful . . ." (1) to possess ". . . any machine or mechanical device which is not manufactured or equipped with an automatic payoff mechanism" (Section 1); (2) to possess ". . . any salesboard or sales ticket intended for trade stimulation purposes where merchandise only is dispensed" (Section 3); (3) to operate a ". . . public cardroom not to exceed eight tables wherein persons engage in games of skill . . ." (Section 4); (4) to possess and operate paraphernalia ". . . for use in the game of bingo . . ." pro-

vided the game is conducted for the benefit of certain enumerated nonprofit charitable organizations and ". . . the proceeds thereof are not to inure to the profit of any individual. . . ." (Section 5)

The practices and devices designated as lawful can only be employed and used if

". . . located in any incorporated city or town, or all that portion of any county not included within the limits of incorporated cities and towns where the same is licensed *or taxed.*" (Italics ours.) (Section 3)

Section 2 of the act makes it unlawful for the user of any mechanical device, described as lawful in section 1, to receive anything of value except ". . . free plays and the playing of additional games . . ."

Section 6 sets forth certain licensing criteria; section 7 is a licensing "grandfather clause"; section 8 is a severability clause.

The question before us arises from section 9, which provides:

"This act is necessary for the immediate preservation of the public peace, health and safety, the support of the state government, and its existing public institutions, and shall take effect immediately."

March 7, 1963, the act was passed by both houses of the legislature. March 11, 1963, the Governor vetoed the words "*or taxed,*"[1] and the licensing "grandfather clause."[2] In his veto message to the senate, the Governor stated:

---

[1]In his veto message to the senate, the Governor stated: "I hereby veto these items in Sections 1, 3, and 4 to make it plain that the non-gambling activities permitted under this statute may be exercised only by such municipal subdivisions of the state as are willing to license the respective activities or devices."

[2]In his veto message to the senate, the Governor stated:

"Section 7 would permit persons, firms, or corporations which had been licensed by a city council, board of trustees or board of county commissioners prior to March 1, 1963 to become automatically eligible to receive a bingo, state fair or similar license. I believe that each licensee under this act should be carefully scrutinized and only those persons who are citizens of the United States and who have been residents of the State of Washington for at least five years prior to application should be allowed to obtain licenses under this act. In the

"I will allow the remainder of the bill to become law without my signature, in accordance with the additional explanation appended to the bill and to this message."

In the "additional explanation," the Governor said:

"I have deliberately *refrained* from vetoing an emergency clause contained in Senate Bill 360 in order to allow the constitutionality of this measure to be tested at once. This emergency clause permits the bill to take effect immediately; therefore, allowing a court test of the constitutionality of this bill at once by anyone who might desire to do so."

The question for our determination is simply this: Is section 9—the emergency clause—valid so that the act becomes effective immediately, or, is the emergency clause invalid so that the act is subject to a possible referendum vote by the people?

In view of the many overtones that have been developed by counsel and amici curiae, we point out that this case *does not involve* the constitutionality of the act or the efficacy of the Governor's item veto, nor do we have before us the question of *how* or *when* the constitutionality of the act may be tested. The expediency of the act is, of course, not justiciable; expediency is a legislative problem.

█ The people are the genesis of all political and legislative power.[3]

. Article 2, § 1, of the state constitution provides:

"The legislative authority of the state ·. . . shall be vested in the legislature, . . . but the people reserve to themselves the power to propose . . . laws, and to enact or reject the same at the polls, independent of the legislature, *and also reserve power . . . to approve or reject at the polls any act, item, section or part of any . . . law passed by the legislature.*

---

case of firms or corporations, I believe all officers and stockholders should first fulfill the residence requirements provided in Section 6 of the statute."

·  [3]Washington Constitution, Art. 1, § 1:

"All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights."

"(a) Initiative: The first power reserved by the people is the initiative. . . .

"(b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, *except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions,* . . ." (Italics ours.)

The people's reserved right to exercise the initiative and referendum was placed in the state constitution by amendment 7, adopted in 1912. Its political history and the impact of the amendment upon the law of this state have been discussed, exhaustively, in *State ex rel. Brislawn v. Meath*, 84 Wash. 302, 147 Pac. 11 (1915); *State ex rel. Blakeslee v. Clausen*, 85 Wash. 260, 148 Pac. 28 (1915); and *State ex rel. Case v. Howell*, 85 Wash. 281, 147 Pac. 1162 (1915).

We believe it self-evident that, by the adoption of amendment 7, the people intended to mark a line between laws that might be emergent and those that clearly are not, reserving to themselves the right to pass upon legislative acts that affect public measures and policies; that they fixed a limit beyond which the legislature cannot go without doing violence to the will and voice of the people; that the legislature has no right to tack an emergency clause onto an act in order to prevent the people from exercising their right of referendum, unless that act is clearly within the *exception* set forth in the amendment.

In *State ex rel. Howell v. Superior Court*, 97 Wash. 569, 577, 166 Pac. 1126 (1917), Judge Parker, writing the court's majority opinion, stated:

"Whatever divergence of opinion there may be among the courts touching the meaning of constitutional or statutory provisions relating to the initiative and referendum, we think it safe to say that all courts that have spoken upon the subject agree that such provisions are to be *liberally construed*, to the end that these popular legislative rights of the people reserved in the several constitutions where found may be preserved and rendered effective." (Italics ours.)

A review of all the decisions of this court upon the question prompts two observations: first, Judge Parker's reference to "liberal construction" was over-optimistic; and second, there is a most delicate balance between the emergent powers of the legislature and the people's right of referendum. The latter observation is buttressed by the fact that in almost every prior decision on this point, the court was divided, or there was a concurring opinion based on reasons different from those expressed by the majority.

On at least 11 occasions this court has upheld the efficacy of emergency clauses[4]; on 7 occasions we have struck them down.[5]

The question before us is one of construction or interpretation of an act of the legislature and of a provision of the constitution; this is a judicial question.

[4] *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 148 Pac. 28 (1915) (construction of highways); *State ex rel. Case v. Howell,* 85 Wash. 281, 147 Pac. 1162 (1915) (financing local improvement districts); *State ex rel. Case v. Howell,* 85 Wash. 294, 147 Pac. 1159 (1915) (regulation of common carriers on streets); *State ex rel. Anderson v. Howell,* 106 Wash. 542, 181 Pac. 37 (1919) (motor vehicle code); *State ex rel. Short v. Hinkle,* 116 Wash. 1, 198 Pac. 535 (1921) (administrative code); *State ex rel. Reiter v. Hinkle,* 161 Wash. 652, 297 Pac. 1071 (1931) (excise tax on butter substitutes); *State ex rel. Shelor v. Hinkle,* 162 Wash. 702, 298 Pac. 1070 (1931) (motor vehicle license fees and tax); *State ex rel. Hamilton v. Martin,* 173 Wash. 249, 23 P. (2d) 1 (1933) (bonds to alleviate state-wide unemployment and poverty); *State ex rel. Pennock v. Reeves,* 27 Wn. (2d) 739, 179 P. (2d) 961 (1947) (old age and general assistance); *State ex rel. Pennock v. Coe,* 42 Wn. (2d) 569, 257 P. (2d) 190 (1953) (department of public assistance); *State ex rel. Hoppe v. Meyers,* 58 Wn. (2d) 320, 363 P. (2d) 121 (1961) (increasing motor fuel tax).

[5] *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 Pac. 11 (1915) (change of personnel—state land commission); *State ex rel. Mullen v. Howell,* 107 Wash. 167, 181 Pac. 920 (1919) (ratification of federal prohibition amendment); *State ex rel. Satterthwaite v. Hinkle,* 152 Wash. 221, 277 Pac. 837 (1929) (abolished state highway committee and established highway department); *State ex rel. Burt v. Hutchinson,* 173 Wash. 72, 21 P. (2d) 514 (1933) (authorizing horse racing and pari-mutuel system); *State ex rel. Robinson v. Reeves,* 17 Wn. (2d) 210, 135 P. (2d) 75, 146 A.L.R. 280 (1943) (acquisition of private utility by public utility district); *State ex rel. McLeod v. Reeves,* 22 Wn. (2d) 672, 157 P. (2d) 718 (1945) (appointment of game commissioners); *State ex rel. Kennedy v. Reeves,* 22 Wn. (2d) 677, 157 P. (2d) 721 (1945) (administration of state timber).

By what rule shall the question be tested? It would be inaccurate to say that our former decisions have been consistent in discussing and announcing the rule to be applied.

■ In *State ex rel. Hoppe v. Meyers*, 58 Wn. (2d) 320, 326, 363 P. (2d) 121 (1961) (the most recent opinion on the question), the court said:

"With regard to the weight to be given such clauses, the rule to which this court has most consistently adhered, is that most recently stated in *State ex rel. Pennock v. Coe*, 42 Wn. (2d) 569, 257 P. (2d) 190, quoting from *State ex rel. Pennock v. Reeves*, 27 Wn. (2d) 739, 179 P. (2d) 961:

" ' " . . . such legislative declaration of emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, we will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. *State ex rel. Hamilton v. Martin*, 173 Wash. 249, 23 P. (2d) 1. We must give to the action of the legislature and its declaration of an emergency every favorable presumption." ' "

The touchstone of the rule is " . . . what appears upon the face of the act, aided by the court's judicial knowledge."

The face of the act is patently devoid of any facts relating to an emergency (with the exception of the emergency clause itself). The act repeals nothing; it appropriates nothing; it taxes nothing. In nowise is the act comparable to the act considered by the court in *State ex rel. Hamilton v. Martin*, 173 Wash. 249, 23 P. (2d) 1 (1933), wherein the act recited *facts* showing an emergent situation, which facts were, for the most part, capable of judicial knowledge. We do not indicate that the inclusion of a legislative declaration of policy in an act would, ipso facto, remove the emergency clause from the ambit of the court's constitutional duty to project and test the clause upon the backdrop of the constitution.

A more subtle question is presented when we are called upon to bring into play our "judicial knowledge" in the decision of the instant case.

In the brief of the Attorney General, we are asked to judicially notice a letter from the Washington State Tax Commission. This letter sets forth the revenue from taxes on mechanical devices during a 5½-year period (July 1, 1958—June 30, 1962, and the first 6 months of the 1962-63 fiscal year) received by the state, King County, city of Seattle, and the city and county of Yakima. We have taken judicial notice of the letter, but fail to appreciate its relevancy. The figures disclose no emergency, but a rather consistent collection of taxes.

■ Judicial notice, of which courts may take cognizance, is composed of facts capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy and verifiable certainty. The court may

". . . resort to encyclopedias, authoritative works upon the subject, reports of committees, scientific bodies, and any source of information that is generally considered accurate and reliable . . ." *Ritholz v. Johnson*, 244 Wis. 494, 502, 12 N. W. (2d) 738, 741 (1944).

In *Mickelson v. Williams*, 54 Wn. (2d) 293, 340 P. (2d) 770 (1959), this court said:

". . . judicial notice may not be taken of a custom or usage, *local in nature*, without the proof of its existence and application. . . ." (Italics ours.)

We are urged by amici curiae to take judicial notice of the fact that one city in the state recently changed its administrative policy applicable to Laws of 1909, chapter 249; that many people have lost employment in that city as a result of the change in administrative policy. This, it is argued, makes Laws of 1963, chapter 37, emergent and necessary for the "support of state government and its existing public institutions."

■ We do not agree for two reasons: first, the administrative policy of a *single* city—which may change from day to day—is not a determinative fact that we should notice judicially in the instant case; it is "local in nature"; second, assuming that the facts claimed exist, the conclu-

sion does not follow from the major and minor premises of the syllogism.

■ Next, it is urged that chapter 37 is emergent because it is for the "immediate preservation of the public peace, health or safety." We are unable to equate pinball machines (§ 1), punchboards (§ 3), bingo (§ 5), and cardrooms (§ 4) to an immediate threat to the populace. " 'Public peace, health or safety' . . . refer to perils which may beset the state or its citizens . . ." *State ex rel. Blakeslee v. Clausen*, 85 Wash. 260, 274, 148 Pac. 28 (1915).

Finally, it is argued that the act explains and clarifies chapter 249, Laws of 1909. Assuming, *arguendo*, this clarification is accomplished, we are unable to conceive of an emergency springing from a law which has been in force for 54 years.

■ Neither the act upon its face, nor those factors of which judicial notice can be taken, indicate a situation justifying the inclusion of an emergency clause.

The writ of mandate will issue and respondent is directed to accept, file and process documents submitted to him by relator for the purpose of implementing a referendum of Laws of 1963, chapter 37, providing said documents are in accordance with the law.

It is so ordered.

OTT, C. J., HILL, HAMILTON, and HALE, JJ., concur.

FINLEY, J. (dissenting)—The majority have quoted the following language from *State ex rel. Hoppe v. Meyers* (1961), 58 Wn. (2d) 320, 326, 363 P. (2d) 121, which is the most recent pronouncement by this court as to the validity of an "emergency clause":

"With regard to the weight to be given such clauses, the rule to which this court has most consistently adhered, is that most recently stated in *State ex rel. Pennock v. Coe*, 42 Wn. (2d) 569, 257 P. (2d) 190, quoting from *State ex rel. Pennock v. Reeves*, 27 Wn. (2d) 739, 179 P. (2d) 961:
" ' ". . . *such legislative declaration of emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative*

declaration, we will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. *State ex rel. Hamilton v. Martin*, 173 Wash. 249, 23 P. (2d) 1. *We must give to the action of the legislature and its declaration of an emergency every favorable presumption.*" ' " (Italics mine.)

The majority formulate and state as their conclusion the following:

"Neither the act upon its face, nor those factors of which judicial notice can be taken, indicate a situation justifying the inclusion of an emergency clause."

I am convinced that the majority have misconceived, among other things, the proper placement of the burden of proof as to the matter presented to the court for evaluation and resolution in this case. The majority have apparently placed the burden of proving the validity of the use of an "emergency clause" by the state legislature upon the defenders of that legislative declaration. This obligation, as imposed by the majority, to affirmatively validate the legislative declaration is clearly in conflict with the rule enunciated and emphasized in *State ex rel. Hoppe v. Meyers*, *supra*, and quoted with approval in the majority opinion. In other words, the rule of the *Hoppe* case succinctly stated is that the legislative declaration is conclusive unless it is shown to be obviously false. In *State ex rel. Pennock v. Coe* (1953), 42 Wn. (2d) 569, 584, 257 P. (2d) 190, this court quoted with approval the following language from *State ex rel. Reiter v. Hinkle*, 161 Wash. 652, 297 Pac. 1071:

" 'No facts of which we will take judicial notice are called to our attention which justify a holding that the emergency clause is a mere pretense, for which reason we should brush aside the solemn legislative declaration. . . .' "

Thus, it appears beyond question, from the previous decisions of this court, that the burden of proof must fall upon the party attacking the validity of an "emergency clause", since the legislative declaration is conclusive unless it is shown to be obviously false. In the instant case the relator has simply failed to sustain that burden. Actually, the prin-

cipal thrust of the relator's argument has been directed to the constitutionality of the act itself (Chapter 37, Laws of 1963), and the majority have correctly stated that issue is not before the court in this proceeding.

Article 2, § 1(b), placed in the state constitution by amendment 7 in 1912, provides:

"Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions, . . . "

We have consistently held that the word "or" was apparently inadvertently omitted before the word "support", and, therefore, the above quoted section of the constitution has always been read as though the word "or" had not been omitted. *State ex rel. Hoppe v. Meyers, supra.* Thus an act is not subject to referendum if it is either for (1) the immediate preservation of the public peace, health or safety, or (2) the support of state government and its institutions. Furthermore, it should be emphasized that the word "immediate" does not modify the word "support". In *State ex rel. Pennock v. Coe, supra,* one member of the court, in a concurring opinion, contended that the word "immediate" modified "support"; but that contention was rejected in the majority opinion, which was signed by seven members of the court. Thus, if the instant act comes within the support of government exemption from the right of referendum, it is not necessary to find the act "emergent" in an immediate sense.

The phrase "emergency clause" is merely a label used in common parlance. The phrase does not appear in the referendum provision of the state constitution. There is no question but that the phrase "emergency clause" connotes a sense of immediateness, and I believe that the majority's use of that label has led them into requiring a showing of a need for immediateness. However, as previously discussed, under our constitutional provisions, there is no ne-

cessity to show a need for immediateness if the support of the state and its institutions is involved.

The majority have properly pointed out the existence of a delicate balance between the electorate's right to referendum and the so-called "emergent" powers of the legislature, relative to the continuity of state government. However, it seems to me that the majority, in seeking to perform this delicate balancing indigenous to the judicial process, have overemphasized one side of the scales in requiring a showing of *immediateness*. There is an extensive discussion about the referendum amendment in *State ex rel. Blakeslee v. Clausen* (1915), 85 Wash. 260, 267, 148 Pac. 28, and I believe that consideration of the following passage from that case places the "delicate balance" in better perspective:

"Several years before the legislature submitted the amendment to our constitution, the people of Oregon had adopted the initiative and referendum with practically no limitations. Their constitution reads, 'except as to laws necessary for the immediate preservation of the public peace, health, or safety.'

"It was a matter of common knowledge that, under this unbridled license to refer legislation, the state university had been denied the benefit of an appropriation for its support and maintenance; that one of the state institutions exercising an essential function of the state had been crippled and embarrassed and but for the pledge of private credit would have been destroyed, for a time, at least.
. . .

" . . . We may well assume that the people of this state *had no intention of falling into the error that Oregon had made, and so framed their constitution that our government and its institutions should not be put to the embarrassments* that might follow an agitation which could be supported and a vote compelled by a number of the electors so small that it may be said to be merely nominal— . . . " (Italics mine.)

The majority's requirement of "immediateness" to justify the use of the "emergency clause" constitutes a reading of our constitution as though it were the same as the Oregon provision referred to in the above quotation.

The majority, after stating that the instant act neither appropriates nor taxes anything, blithefully conclude that the support exclusion from referendum does not apply. Support is not confined to expenditures made for the operation and maintenance of the state and its institutions, but extends necessarily to the raising of revenue required to finance appropriations. On numerous occasions this court has stated that the term "support" should be used in its fullest sense. See: *State ex rel. Hoppe v. Meyers, supra*; *State ex rel. Reiter v. Hinkle, supra*; *State ex rel. Short v. Hinkle* (1921), 116 Wash. 1, 198 Pac. 535. Therefore, an act which seeks to maintain, or materially to assist, in the collection or effective continuation of taxation would come within the broad concept of support.

The majority have taken judicial notice of a letter from the state tax commission setting forth tax revenues from "mechanical devices":

| Fiscal Year | State | King County | City of Seattle | Yakima County |
|---|---|---|---|---|
| 1958 | $1,593,096.37 | $70,281.86 | $ 935,364.24 | $75,859.48 |
| 1959 | 1,693,245.68 | 76,310.80 | 1,053,561.57 | 91,147.58 |
| 1960 | 1,804,448.77 | 64,897.80 | 1,129,308.86 | 67,266.47 |
| 1961 | 1,684,766.03 | 50,243.54 | 1,042,983.65 | 81,198.68 |
| 1962 | 1,705,232.50 | 47,695.86 | 1,060,220.38 | 79,831.51 |

But the majority state that they fail to appreciate the relevancy of this computation of tax revenues. Contrariwise, it seems quite clear to me that these figures are relevant, because they indicate a substantial and fairly constant flow of tax revenues for the support and continuity of state government through December 1962, despite the existence of chapter 249, Laws of 1909.

Before proceeding further, it is appropriate to consider the scope of judicial notice which should reasonably be exercised by the court. The majority have placed a very narrow construction upon the permissible scope of judicial notice. I think that the majority's confining concept of judicial notice will place a real restriction upon those who are confronted by an "emergency clause" when seeking to exercise the right of referendum. It has been previously stated that the burden is clearly upon the petitioner to show that

the legislative declaration of "emergency" is false. This can only be accomplished by resorting to the face of the act and to those things of which the court will take judicial notice. Thus, if the scope of judicial notice is restricted in these proceedings, as is advocated by the majority, those attacking the validity of "emergency clauses" in the future will be placed in a very difficult position in attempting to sustain their burden of proof. The majority's statements relative to judicial notice are perhaps inadvertently prompted by the anomalous situation herein presented; the defenders of the clause, who do not have the burden of proof, are seeking to have the court take judicial notice.

With reference to the permissible scope of judicial notice in situations such as the instant case, we should consider the following quotation from *State ex rel. Short v. Hinkle* (1921), 116 Wash. 1, 6, 198 Pac. 535:

" . . . We are asked to say that the solemn statement of the legislature is false, and to say so, not because we are possessed of any knowledge upon the subject, but because we are ignorant upon it. We can take no testimony; we have no machinery with which to gather the facts, which the legislature is presumed to be possessed of, but, totally in the dark, we are asked to substitute our personal prejudices, predilections and preconceptions for the presumably enlightened judgment of those deputed by the constitution of the state to inquire into and determine these factual problems. . . ."

I do not mean by the insertion of the above quotation that we should blindly uphold the legislative incorporation of a so-called "emergency clause". However, I do feel that this quotation points out the need for a reasonable evaluation and utilization of the concept of judicial notice,[6] particularly in public-interest, public-law situations. In *State ex rel. Washington Toll Bridge Authority v. Yelle* (1960), 56 Wn. (2d) 86, 351 P. (2d) 493, we took judicial notice of the commonly known situation in the Seattle area: traffic congestion and residential expansion.

---

[6]See: Appellate Courts use of facts outside of the Record by resort to judicial notice and independent investigation, 1960 Wis. L. Rev. 39.

In the instant case we should again take notice of a commonly known situation in Seattle—known to the members of the Washington State Legislature and a substantial proportion of the state's inhabitants. In particular, I am referring to the pronouncement by the chief law enforcement official in the city of Seattle in the fall of 1962 that as of January 1, 1963, the so-called "tolerance policy" would be terminated. This decision to terminate was based upon the hypothesis that the activities permitted under the "tolerance policy" were in violation of chapter 249, Laws of 1909 (RCW 9.47). There exists a gray area of activities which are difficult to classify as being either within or without the prohibition of the 1909 laws; thus, there is confusion in the realm of law enforcement. In January 1963, the chief law enforcement official of the city of Seattle stated that the legislature should remove the inconsistencies and confusion from this area. The instant act is an attempt by the legislature to bring some semblance of order out of the chaos and confusion that now exist in this area, and to afford the opportunity to permit the continuation of the flow of tax revenues to the state and its subdivisions.

Activities which have been discontinued or greatly curtailed due to an administrative interpretation placed upon the 1909 act by the law enforcement officials of Seattle are subject to both state and local taxes and license fees. The magnitude of those tax revenues is indicated by the previously quoted statistics provided by the state tax commission, and it must be borne in mind that those figures relate only to the state tax imposed upon mechanical devices under RCW 82.28. It is obvious that the curtailment and discontinuation of those activities in the state's largest population center will result, and has resulted, in a substantial diminution of tax revenue. Both state and local revenues are thus imperiled by the recent administrative construction placed upon the 1909 act by some local law enforcement officials. The instant act seeks to clarify the 1909 act and remove the confusion existing in this area of law. Thus, the legislature has sought to alleviate the threat to tax revenue by equating the stability and consistency of law

enforcement with the stability and consistency of tax revenues.

The majority have correctly pointed out that "The expediency of the act is, of course, not justiciable; expediency is a legislative problem." Thus, the question of whether the instant act is expedient—or for that matter will be successful substantially in stemming the present decrease in tax revenue is not germane to our consideration of the act.

In conclusion, I would reiterate that, since the instant act relates to the support of the state government and its institutions, there is no need to find that the element of immediateness is present. In this connection I am convinced that the "emergency clause" label may have led the majority into error in emphasizing immediateness where no such requirement is necessary. Furthermore, I believe it pertinent, in concluding, to reiterate the lines from the quotation commencing this dissent:

" ' " . . . such legislative declaration of emergency . . . is conclusive and must be given effect, unless the declaration on its face is obviously false; . . . We must give to the action of the legislature and its declaration of an emergency every favorable presumption." ' "

For the reasons hereinbefore stated, I would deny the writ of mandate.

DONWORTH, ROSELLINI, and HUNTER, JJ., concur with FINLEY, J.