[No. 29625. *En Banc.* April 2, 1945.]

THE STATE OF WASHINGTON, *on the Relation of Kathryn H. Kennedy et al., Plaintiff,* v. BELLE REEVES, *as Secretary of State, Respondent.*[1]

*Shorett & Taylor,* for relators.

*The Attorney General* and *Simon Wampold, Jr., Assistant,* for respondent.

ROBINSON, J.—The relators allege that they are legal voters of the state of Washington and constitute a committee known as "Committee for Referendum of Chapter 202 of Laws of 1945." The respondent is the duly elected, qualified, and acting secretary of state of the state of Washington.

[1]Reported in 157 P. (2d) 721.

On March 17, 1945, the committee filed an application in this court for a writ of mandamus to be directed to the respondent in her official capacity, commanding her to accept for filing certain papers and documents designed to initiate a referendum as to chapter 202, p. 579, Laws of 1945. Attached to the application, and by reference made a part thereof, is an affidavit by Kathryn H. Kennedy, which states, in substance, that the relators, on March 17th, being desirous of subjecting chapter 202 of the Laws of 1945 to referendum, offered for filing in the office of the respondent secretary of state typewritten copies of the act, together with copies of a petition for referendum, setting forth therein such facts as are required by law, duly authenticated under oath. A copy of this petition is attached to the application, marked as exhibit B, and it is further alleged that relators requested and demanded of the respondent that she receive the papers and documents so tendered, file them in her office, give the measure a serial number, and transmit to the attorney general of the state of Washington a copy of such measure, bearing its serial number, for such action by the attorney general as is prescribed by law; and that, notwithstanding such request and demand, the respondent wholly refused to comply therewith, stating that she did so, and would continue to do so, because of a provision included in the act which reads as follows:

"This act is necessary for the immediate preservation of the public peace, health and safety and for the immediate support of the state government and its existing public institutions and shall take effect immediately."

After examination of the application, with its attached, incorporated exhibits, the court entered the following order:

"It Is Hereby Ordered that an Alternative Writ of Mandamus issue herein and the above named Belle Reeves, Secretary of State of the State of Washington, respondent herein, is hereby commanded, immediately upon service of this writ upon her, to accept the said papers and documents so offered for filing in her office by the relators and to take the steps required of her by law with respect to the submission of said Act of the Legislature of the State of Washington to a referendum of the people, or, in the alternative,

that the said respondent show cause before this Court at the Courtroom thereof in the Temple of Justice at the City of Olympia, Thurston County, State of Washington, on the 2nd day of April, 1945 at 9:00 a. m. at the opening of Court on that day why she has not done so."

Subsequently, with the assent of all parties, the return day was advanced to March 30th. On that day, the respondent made no effort to show cause why the writ should not be granted, other than by challenging the application for want of facts to warrant the relief prayed for, or any relief, making the challenge both by motion to quash and by general demurrer, thereby admitting, for the purpose of the hearing, all factual allegations.

The case, of course, revolves entirely around the subject of emergency clauses and their effects. That there is a great deal of confusion of thought as to this subject, has been amply demonstrated by recent events, a confusion to which this court has in some measure contributed, as was acknowledged in the comparatively recent decision in *State ex rel. Robinson v. Reeves*, 17 Wn. (2d) 210, 135 P. (2d) 75, in commenting on our former decision in *State ex rel. Short v. Hinkle*, 116 Wash. 1, 198 Pac. 535. It would seem that we have arrived at a point where it is well to heed the admonition which the people, in adopting our constitution in 1889, attached to the first article of the instrument, which article is entitled "Bill of Rights":

"§ 32. A frequent recurrence to fundamental principles is essential to the security of individual rights, and the perpetuity of free government." 1 Rem. Rev. Stat., p. 389.

The very first section of that bill of rights is pertinent to our present discussion. It reads as follows:

"§ 1. All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." 1 Rem. Rev. Stat., p. 347.

In article II, § 1, of the constitution, the people created the legislature and made to it a full and complete delegation of their inherent legislative power:

"§ 1. The legislative powers shall be vested in a senate and house of representatives, which shall be called the legislature of the state of Washington." 1 Rem. Rev. Stat., p. 390.

But, in 1912, the people amended article II, § 1, and took back into their own hands a great deal of that power; in fact, a great deal more, we think, than has been generally realized. We quote the first paragraph of amendment seven to the state constitution:

"The legislative authority of the state of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the state of Washington, but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, *and also reserve power, at their own option, to approve or reject at the polls any act, item, section or part of any bill, act or law passed by the legislature.*" (Italics ours.) 1 Rem. Rev. Stat., p. 519.

It is with the italicized portion of the foregoing quotation that we are directly concerned. The relators desire to exercise the power therein reserved. They are here asserting the right to exercise the option therein granted. In other words, they are asserting a constitutional right which it would seem that they are *prima facie* entitled to enforce, unless some lawful exception to that all-inclusive reservation be made to appear.

There are exceptions defined by general language in a later paragraph of the amendment which will be stated in due course. Necessarily, there had to be exceptions; for a state-wide election under a referendum system cannot be held without considerable delay, and, in the meantime, the state government and its existing public institutions must be supported. As shown by paragraphs (c) and (d), it was deemed necessary to allow ninety days for filing a referendum, and it is provided in paragraph (d):

"All elections on measures referred to the people of the state shall be had at the biennial regular elections, except when the legislature shall order a special election." 1 Rem. Rev. Stat., p. 520.

Hence, unless a special session of the legislature be called, and, having been called, orders a special state-wide election, a bill passed this last session, subjected to referendum, cannot become a law until thirty days after the next biennial election even if it is approved by the people; that is, not until December, 1946.

Obviously, neither the state government nor its institutions could operate without funds for well-onto two years. During a legislative session, it might appear that legislation was immediately required to avert immediate danger to the public peace. An epidemic of vast proportions might be threatening the public health, or some great catastrophe might require immediate relief. The amendment, wisely and indeed necessarily, guarded against such contingencies by providing:

"The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, *except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions,* . . ." (Italics ours.)   1 Rem. Rev. Stat., p. 520.

We think it too clear to require argument that the legislature cannot defeat the constitutional right, reserved by the people in the introductory paragraph of amendment seven,

" . . . at their own option, to approve or reject at the polls any act, item, section or part of any bill, act or law passed by the legislature," (1 Rem. Rev. Stat., p. 519.)

by *merely* inserting in an act the statement included in chapter 202, p. 579, Laws of 1945, which is assigned by the respondent as the ground for refusing to file the papers and documents presented to her for filing, to wit:

"This act is necessary for the immediate preservation of the public peace, health and safety and for the immediate support of the state government and its existing public institutions and shall take effect immediately."

Such a label may obviously be utterly and completely false. It would be scandalous indeed if the constitutional right of referendum could be thwarted by the mere use of

false labels. As was said in argument, "If this can be done, the right of referendum is a dead letter in this state."

█ The court does not arrogate to itself the power of deciding whether or not an emergency clause is justified. It is forced to deal with, and decide, that question in the ordinary and regular performance of its duties. The instant case is an example. The relators assert that the people have the constitutional right to approve or reject chapter 202, Laws of 1945, at the polls, and that the exercise of that right is being denied them, and they ask the assistance of the court in enforcing it. It, therefore, becomes our judicial duty to decide whether they have that right, and, if we find that they have, to use the appropriate means to enforce it. Unless we can say that the act is, *in fact,* necessary for the immediate preservation of the public peace, or for the immediate preservation of the public health, or for the support of the state government and its existing public institutions, the relators are of right entitled to the writ prayed for.

█ We do not think it necessary to quote the text of chapter 202 in order to demonstrate that it is not necessary for any of these purposes. The title of the act, which we now quote, sufficiently indicates its content:

"An Act providing for unification of control and jurisdiction over the sale of, reforestation of and administration of state timber including forestry practices; creating a State Timber Resources Board; defining its powers and duties; transferring to the Supervisor of Forestry all powers and duties in connection with the sale of timber, forest and forestry policy, management and practice, and reforestation now vested in the Board of State Land Commissioners, State Capitol Committee, State Forest Board, Commissioner of Public Lands and State Park Committee; changing and fixing the qualifications for office of the Supervisor of Forestry; and repealing all acts and parts of acts in conflict herewith, and declaring an emergency."

It was strenuously argued at the hearing on March 30th, and also in the respondent's briefs, that chapter 202 is necessary for efficiency in state government; that it is necessary as an economy measure; that thousands of dollars will be

saved by unification of control of jurisdiction and by the elimination of duplicating functions; that the complexity of the present law is such, and there is partial jurisdiction in so many agencies, that even a professionally trained man is baffled when he seeks to ascertain what timber is for sale and by what agencies, and much more to the same general effect. But all this is completely irrelevant. We, of course, express no opinion as to the merits of the act. Let it be conceded that it is highly beneficial in character. That does not establish that it is necessary for the immediate preservation of the public peace, health or safety, or support of the state government and its existing public institutions. The word "support" cannot be interpreted to mean "benefit." Presumably, all laws have a beneficial purpose. The rights of the people reserved by the seventh amendment to determine for themselves whether or not the act is desirable and beneficial cannot be whittled away by any such interpretation of the word "support."

Counsel for the respondent have in no way attempted to point out specifically or concretely how chapter 202 may be thought to meet the specifications of paragraph (b) of the amendment, which we have so often quoted in this opinion. It is merely stoutly asserted that we cannot say that it does not.

In addition to arguments that the law is highly beneficial, which may very well be true, we have been confronted with general statements culled from former decisions as to the strength of the presumptions which should be indulged in in favor of legislative declarations of emergency. With all due respect, and with the earnest desire not to seem either censorious or facetious, we feel that we must say frankly and in all seriousness that the custom of attaching emergency clauses to all sorts of bills, many of which cannot by any stretch of the imagination be regarded as actually emergent, within the meaning of the test laid down in paragraph (b) of the seventh amendment, has become so general as to make it appear, in the light of recent experience, that a number of those statements can no longer be deemed controlling. It, of course, will never be presumed

that the legislature deliberately intended to infringe upon a constitutional right.

Since the people, by the terms of the constitution as amended by amendment seven, are manifestly entitled,

". . . at their own option, to approve or reject at the polls any act, item, section or part of any bill, act or law passed by the legislature,"

unless it be demonstrated that the law is of the type excepted in paragraph (b) of amendment seven, and no such showing having been made, the relators are clearly entitled to the writ prayed for, and it will accordingly issue forthwith.

It is so ordered.

BEALS, C. J., MILLARD, STEINERT, BLAKE, SIMPSON, JEFFERS, MALLERY, and GRADY, JJ., concur.