115 P.3d 301 (2005)
WASHINGTON STATE FARM BUREAU FEDERATION, Washington State Grange, National Federation of Independent Business, Building Industry Association of Washington, Evergreen Freedom Foundation, and Dan Wood, individually, Petitioners,
v.
Sam REED, in his official capacity as Secretary of State of the State of Washington, Respondent.
No. 77010-7.
Supreme Court of Washington, En Banc.
Argued June 30, 2005.
Decided July 14, 2005.
*302 Diana M. Kirchheim, Richard M. Stephens, Groen, Stephens & Klinge LLP, Bellevue, WA, for Petitioner.
Jeffrey Todd Even, Office of The Attorney General, Maureen A. Hart, Attorney at Law, Robert M. McKenna, Attorney General's Office, James Kendrick Pharris, Attorney at Law, Office of Atty. General, Olympia, WA, for Respondent.
Paul J. Lawrence, Attorney at Law, Michael K. Ryan, Matthew J. Segal, Preston Gates & Ellis LLP, Seattle, WA, for Amicus Curiae on behalf of League of Educatio Voters, Amicus Curiae on behalf of Washington Association of School Administrators.
William R. Maurer, Charity Osborn, Institute for Justice Washington Chapter, Jeanette Motee Petersen, Institute for Justice, Seattle, WA, for Amicus Curiae on behalf of Institute for Justice, Washington Chapter.
Kristopher Ian Tefft, Association of Washington Business, Olympia, WA, for Amicus Curiae on behalf of Association of Washington Business.
C. JOHNSON, J.
¶ 1 This case is an original action filed in this court, seeking a writ of mandamus directing Secretary of State Sam Reed to accept referendum measure 60 for processing. Referendum 60 is a proposed referendum measure concerning sections 1 and 2 of Substitute Senate Bill 6078, (SSB 6078), Laws of 2005, chapter 72. SSB 6078 amended RCW 43.135.035 to "suspend" the requirement that any legislative action to raise state revenue must be passed by a two thirds vote of each house. The secretary of state rejected the proposed referendum because sections 1 and 2 of SSB 6078 are subject to an emergency clause. We deny the petition for a writ of mandamus.

FACTS & PROCEDURAL HISTORY
¶ 2 RCW 43.135.035, approved by the voters in 1993, provides:
After July 1, 1995, any action or combination of actions by the legislature that raises state revenue or requires revenue-neutral tax shifts may be taken only if approved by a two-thirds vote of each house, and then only if state expenditures in any fiscal year, including the new revenue, *303 will not exceed the state expenditure limits established under this chapter.
RCW 43.135.035(1) (emphasis added).
¶ 3 In the 59th legislative 2005 regular session, the legislature passed SSB 6078, chapter 72, Laws of 2005. Section 1 of SSB 6078 provided a statement of legislative intent.[1] Section 2 of SSB 6078 amended RCW 43.135.035 to provide that "between the effective date of this 2005 act and June 30, 2007, any action or combination of actions by the legislature that raises state revenue or requires revenue-neutral tax shifts may be taken with the approval of a majority of members elected to each house...." Section 7(1) of SSB 6078 includes an emergency clause,[2] stating "Sections 1 and 2 of this act are necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing public institutions, and take effect immediately." SSB 6078 was approved by Governor Gregoire on April 18, 2005, and was effective immediately.
¶ 4 In the 2005 legislative session, the legislature enacted the following revenue bills that increased taxes: ESHB 2314, ESB 6096, SSHB 1240, ESSB 6103. Each of these bills raised state revenue covered by RCW 43.135.035 and would have been subject to a two-thirds vote requirement if section 2 of SSB 6078 had not been enacted. Each of these bills passed with less than a two-thirds supermajority in both houses of the legislature.
¶ 5 On April 29, 2005, Dan Wood filed an affidavit for proposed referendum measure with the secretary of state's office, proposing a referendum on Sections 1 and 2 of SSB 6078. The secretary of state designated this affidavit as referendum measure 60 but notified Wood by letter that the proposed referendum would not be processed because sections 1 and 2 of SSB 6078 were covered by an emergency clause and not within the scope of referendum.
¶ 6 On May 3, 2005, the Washington State Farm Bureau Federation, the Washington State Grange, the National Federation of Independent Business, the Building Industry Association of Washington, the Evergreen Freedom Foundation, and Dan Wood (Petitioners) petitioned this court for a writ of mandamus to order Secretary of State Sam Reed to accept referendum 60 for processing.

ANALYSIS
¶ 7 Under article IV, section 4 of the Washington State Constitution, we have nonexclusive and discretionary original jurisdiction to issue a writ of mandamus against a state officer. A writ of mandamus "must be issued in all cases where there is not a plain, speedy and adequate remedy in the ordinary course of law." RCW 7.16.170. A writ of mandamus is properly issued to compel the performance of an act or duty expressly required by law. Staples v. Benton County, 151 Wash.2d 460, 464, 89 P.3d 706 (2004).
¶ 8 Petitioners argue that because they have only until July 23, 2005, to gather approximately 100,000 signatures on their petition for referendum, a writ of mandamus is the proper remedy here. However, petitioners cannot circulate their petition for signatures *304 until the Attorney General prepares a ballot title, and the Attorney General cannot prepare a ballot title until the secretary of state processes referendum 60. Petitioners maintain they require immediate resolution of whether the emergency clause enacted in section 7 of SSB 6078 is sufficient to prohibit the secretary of state from processing proposed referendum 60.
¶ 9 The primary issue before us is whether sections 1 and 2 of SSB 6078 are exempt from referendum due to a valid legislative invocation of the emergency clause. Under article II, section 1 of the Washington State Constitution, legislation enacted pursuant to the emergency clause is exempt from the referendum process. The provision states:
The legislative authority of the state of Washington shall be vested in the legislature, ... but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature.
....
(b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, [or[3]] support of the state government and its existing public institutions....
Const. art. II, § 1 (emphasis added). We have consistently recognized that there are two separate and distinct exceptions to the people's right to referendum: (1) legislation promulgated as part of a legislative declaration of emergency and (2) legislation promulgated in support of state government and its existing public institutions. Farris v. Munro, 99 Wash.2d 326, 662 P.2d 821 (1983). Both provisions are generally referred to as the "emergency clause"; however, the second exception does not require either immediacy or an emergency. We have also stated that with respect to the requirement in the second clause, the legislation be in "support of state government." The word "support" is not limited to appropriation measures but encompasses anything that generates revenue for the state. Farris, 99 Wash.2d at 336, 662 P.2d 821; see also State ex rel. Blakeslee v. Clausen, 85 Wash. 260, 270, 148 P. 28 (1915) ("The intent and purpose of the people, as gathered from the words of the constitution and the circumstances attending the adoption of the seventh amendment, impels the holding that the people intended to use the word `support' in its fullest sense.").
¶ 10 Petitioners argue that the rights provided by article II, section 1 of the Washington State Constitution, which grants the people the right to referendum, should be liberally construed. However, petitioners contend that, as an exception to the general rule on referenda, the emergency clause should be strictly construed. The Association of Washington Business maintains that exemption from a referendum is a judicial question subject to de novo review. Amicus. Br. at 11. Additionally, petitioners argue SSB 6078 is devoid of any findings to support the validity of the emergency clause. Petitioners contend that we have only applied the exception to the right to referendum for bills in support of state government where the bills either appropriate money or raise revenues for appropriation. They argue that since SSB 6078 itself does not raise taxes or appropriate money and merely allows the legislature to increase taxes by a majority vote, SSB 6078 itself does nothing to support state government.
¶ 11 The respondent maintains that the legislature's invocation of the emergency clause in SSB 6078 is plainly valid. First, the respondent argues that the petitioners fail to meet their burden to establish that the emergency clause of SSB 6078 is obviously false or a palpable attempt at dissimulation. *305 Second, the respondent argues that the legislature's invocation of the emergency clause is supported "by easily shown facts." Resp't's Br. at 5. The respondent urges us to take judicial notice that none of the major revenue generating bills during the 2005 legislative session were enacted by a super majority, that the law requires the state budget to be adopted not later than 30 days prior to the biennium, that the legislature faced a severe budget deficit, and that revenue increases were the method by which the legislature chose to address the deficit. Resp't's Br. at 14.
¶ 12 The standard of review of a legislative declaration of an emergency is well established in our cases. In CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996), we examined whether an emergency clause included in the Stadium Act, which provided the means for financing construction of SAFECO Field, violated citizens' constitutionally protected right to referendum. We focused our inquiry on whether the Stadium Act was necessary for the immediate preservation of the public peace, health, or safety. In our review of legislative declarations of emergency, we give substantial deference to the legislature. In explaining the standard we employ in reviewing emergency clauses, we stated:
"... such legislative declaration of emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, we will enter upon no inquiry as to the facts but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. We must give to the action of the legislature and its declaration of an emergency every favorable presumption."
CLEAN, 130 Wash.2d 782, 807, 928 P.2d 1054 (quoting State ex rel. Humiston v. Meyers, 61 Wash.2d 772, 778, 380 P.2d 735 (1963)). Additionally, a legislative declaration of the existence of an emergency is deemed conclusive unless it is" `obviously false and a palpable attempt at dissimulation.'" CLEAN, 130 Wash.2d at 808, 928 P.2d 1054 (quoting City of Tacoma v. Luvene, 118 Wash.2d 826, 851, 827 P.2d 1374 (1992)). Furthermore, the question of emergency is treated as a legislative question, and if the act is doubtful, the doubt will be resolved in favor of the declaration of emergency. We affirmed our decision in CLEAN in Brower v. State, 137 Wash.2d 44, 969 P.2d 42 (1998).
¶ 13 In CLEAN, we held that the emergency clause enacted as part of the Stadium Act was necessary for the "immediate" preservation of the public peace, health, or safety. We noted, however, that the Stadium Act did not articulate on its face the reasons the legislature deemed an emergency present. We took judicial notice of facts in the record that led us to determine that a declaration of emergency was justified. Included within the facts in the record we relied on was the fact that the governor called a special session of the legislature to address the proposed stadium bill. In conclusion, we stated "this court is required to grant considerable deference to the Legislature's determination that an emergency exists, giving it every favorable presumption and deferring to its judgment unless it is obvious that the declaration of emergency is false." CLEAN, 130 Wash.2d at 812, 928 P.2d 1054. For this court to substitute its judgment for the legislature's in determining whether an emergency exists "would be most unwise and would constitute a major assault on the historic balance of powers." CLEAN, 130 Wash.2d at 813, 928 P.2d 1054.
¶ 14 Petitioners' argument that the emergency clause prohibiting referendum on sections 1 and 2 usurps the power of the people is unpersuasive. Our decision in CLEAN is the product of close to 90 years of jurisprudence interpreting article II, section 1 of the Washington State Constitution. As the petitioners argue, article II, section 1 provides a "fourth element [to the three branches of government], the people, reserving the right to assert its will over the legislative department of the government." State ex rel. Brislawn v. Meath, 84 Wash. 302, 318, 147 P. 11 (1915). However, this constitutional grant of power to the people is not without limitations. Under the same constitutional provision, the legislature may suspend the *306 people's right to referendum, and we have found this suspension proper when the legislature passes legislation in exercise of its police powers only so far as emergent. State ex rel. Case v. Howell, 85 Wash. 281, 147 P. 1162 (1915). Additionally, we have upheld legislative declarations of emergency where the acts are "in exercise of the police power and those providing for the support of the state and its existing institutions." State ex rel. Pennock v. Reeves, 27 Wash.2d 739, 743, 179 P.2d 961 (1947). Thus, as discussed above, the Washington State Constitution and our jurisprudence dictate that the legislature may suspend the right of the people to order a referendum on a bill where the bill is necessary for the immediate preservation of the public peace, health or in support of state government and its existing public institutions.
¶ 15 Petitioners essentially urge us to abandon the deferential standard of review in examining legislative declarations of emergency under article II, section 1(b) of the Washington State Constitution. We have repeatedly rejected this proposition. Additionally, beyond petitioners' contention that there were no legislative findings to explain the necessity of the bill for the support of state government and its existing institutions, petitioners present no evidence that the legislature feigned the necessity of enacting the emergency clause in order to prohibit referendum. We take judicial notice of facts in the record establishing that the legislative enactment of the emergency clause prohibiting referendum on sections 1 and 2 of SSB 6078 was not obviously false and a mere ruse to deprive the voters of their referendum power. Section 1 of SSB 6078 provides in part "that modifications to the state expenditure limit, after ten years of experience following the initial implementation of Initiative Measure No. 601, will ... better balance the needs of the citizens for essential government services...." Additionally, we note that the legislature extensively debated whether to include emergency language in SSB 6078.
¶ 16 The legislature enacted SSB 6078 in the context of enacting the biennial budget. The immediate effective date of section 2 of SSB 6078 facilitated the support of state government by enabling the legislature to pass revenue generating bills to fund education, health services, the justice system, and water quality programs. In the record presented to us, during the 2005 legislative session the legislature passed four bills that increased taxes covered by RCW 43.135.035, each bill passed by a simple majority. The bills are the following: (1) ESHB 2314, imposing a sales tax on extended warranties and increased sales taxes on liquor and cigarette sales, passed in the Senate 25 yeas, 22 nays, and passed in the House 50 yeas, 48 nays; (2) ESB 6096, reinstating the estate tax, passed in the Senate 25 yeas, 21 nays, and passed in the House 50 yeas, 48 nays; (3) SSHB 1240, increasing real estate excise taxes, passed in the Senate 26 yeas, 22 nays, and passed in the House 52 yeas, 46 nays; (4) ESSB 6103, raising taxes on motor vehicle fuel, passed in the Senate 26 yeas, 22 nays, and passed in the House 54 yeas, 43 nays. Amended Agreed Statement of Facts at 3-4. The increase in revenue provided by these bills became part of the state budget appropriation for the 2005-2007 biennium budget.
¶ 17 As stated in Farris v. Munro, 99 Wash.2d at 336, 662 P.2d 821, if a legislative enactment "generates revenue for the state it is deemed support." Section 2 of SSB 6078 provides that "any action or combination of actions by the legislature that raises state revenue or requires revenue-neutral tax shifts may be taken with the approval of a majority of members elected to each house," tying SSB 6078 to future revenue generating legislative actions. (Emphasis added). Thus, the legislature acted in reliance on SSB 6078 when it passed the above revenue generating measures by majority vote. SSB 6078 provides an umbrella for ESHB 2314, ESB 6096, SSHB 1240, and ESSB 6103 and is unequivocally in support of state government. Given the substantial deference to the legislature in a legislative declaration of emergency, we find that the emergency clause in Section 7 of SSB 6078 covering sections 1 and 2 of that bill is valid.

*307 CONCLUSION
¶ 18 Because we conclude that sections 1 and 2 of SSB 6078 are exempt from referendum under article II, section 1(b) of the Washington State Constitution, due to a valid legislative invocation of the emergency clause, no other issues need to be addressed. The petition for the writ of mandamus is denied.
WE CONCUR: ALEXANDER, C.J., MADSEN, BRIDGE, OWENS and FAIRHURST, JJ.
ALEXANDER, C.J. (concurring).
¶ 19 Although I entirely agree with the majority's determination that sections 1 and 2 of Substitute Senate Bill (SSB) 6078 are exempt from referendum, I feel it is necessary to respond to one point that Justices Sanders and J.M. Johnson make in their dissents. They suggest that the secretary of state violated his statutory and constitutional duties to allow the petitioners' referendum petition to circulate. These dissenters indicate that the secretary's withholding of the referendum, for the reason that the measure to which it applied contained a so-called "emergency clause," caused the referendum to fail because, in the words of one of the dissenters, "there is simply insufficient time remaining to obtain requisite signatures." Dissent at 308 (Sanders, J.).
¶ 20 It is important to note that the time within which referendum petitions can be filed is very constricted. This is not due to any decision of this court or of the secretary of state. Rather, it is due to a provision in our state constitution which provides that "[r]eferendum petitions against measures passed by the legislature shall be filed with the secretary of state not later than ninety days after the final adjournment of the session of the legislature which passed the measure on which the referendum is demanded." WASH. CONST. art. II, § 1(d) (emphasis added). The plain fact is that referendum petitioners, even those armed with the full 90 days within which to obtain signatures equal to four percent of the number of persons voting in the last gubernatorial election, are faced with a difficult task.
¶ 21 The question of whether the secretary of state can refuse to accept a proposed referendum measure for processing, and potentially let the time clock on it run out, simply because the act that the petitioners would submit to the voters contains an emergency clause, is a significant question that this court may find it necessary to address at some future time. It is not, however, necessary or proper for us to do so in the instant case because resolution of that issue is not required. I say that because the challenged sections of SSB 6078 are exempt from referendum. Thus, the aforementioned time limits set forth in the constitution have no application here. Consequently, whether the secretary of state wrongly withheld the referendum petition for all or a portion of the 90-day period is simply not material.
FAIRHURST, J., concurs.
MADSEN, J. (concurring).
¶ 22 I agree with the majority but write to observe that our state constitution provides for a representative form of government. Thus, the people of Washington speak, first and foremost, through their elected representativesthe legislature. Unlike the dissent (Sanders, J.), which appears to believe that courts are the proper forum to resolve political disputes, I prefer to allow the process to work as the founding fathers intended. Since the referendum is unavailable in this case, should the people want to overrule their elected officials they can do so by initiative as they have done in the past.
FAIRHURST, J., concurs.
SANDERS, J. (dissenting).
¶ 23 The majority betrays the sacred trust the people of this state place in this court to preserve inviolate their constitutional right to veto unwanted legislation through referendum. A legislature determined to inoculate itself from referendum, a secretary of state determined to violate his statutory and constitutional duty to allow a referendum petition to at least circulate, combined with a supreme court openly hostile to the people's *308 check on the legislature,[1] brews a potent poison to the people's constitutional role in the legislative process.[2]
¶ 24 A carefully crafted opinion which allows the secretary of state to withhold a referendum petition from circulation regardless of its validity means even a referendum which meets the majority's extraconstitutional ideological standard must fail because there is simply insufficient time remaining to obtain requisite signatures before a final judicial decision can possibly be obtained.[3] Here, for example, even if the petitioners "prevailed" they would have only a week or two remaining, at the most, to obtain 112,000 signaturesan impossible task. And let there be no mistake, the signatories to the majority opinion well understand and specifically intend this result.
¶ 25 But it will be worth it if it is a wake up call to those who naively put their faith and trust in this court to protect our legal entitlement to those democratic institutions we have createdand demandedin our state constitution. Let us repair to, and take to heart, those words of Judge Learned Hand to use our remaining democratic institutions to ensure our free institutions and personal liberty are retained, and restored, in the future:
What do we mean when we say that first of all we seek liberty? I often wonder whether we do not rest our hopes too much upon constitutions, upon laws and upon courts. These are false hopes; believe me, these are false hopes. Liberty lies in the hearts of men and women; when it dies there, no constitution, no law, no court can save it; no constitution, no law, no court can even do much to help it. While it lies there it needs no constitution, no law, no court to save it.
Learned Hand, The Spirit of Liberty [1944], in THE SPIRIT OF LIBERTY: PAPERS AND ADDRESSES OF LEARNED HAND 189-90 (Irving Dilliard ed., 3d ed.1963).
¶ 26 I dissent.
CHAMBERS, J. (dissenting).
¶ 27 I would provisionally grant the petition for a writ of mandamus and allow signature gathering to go forward. I would also leave for another day whether in fact this legislation was properly subject to an emergency clause, protecting it from referendum.
*309 ¶ 28 The majority is absolutely correct that under existing law, the secretary of state properly refused to accept Referendum 60 for processing, and no writ should be issued. If funding for a baseball stadium is an emergency, then very little is not. Contra CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996). But this is based on law we should overrule.
¶ 29 Our constitution vests the initial power to determine whether legislation is either an emergency or necessary for the "support of the state government and its existing public institutions" in the legislature. CONST. art. II, § 1(b). We should show appropriate deference to its judgment. See State ex rel. Humiston v. Meyers, 61 Wash.2d 772, 380 P.2d 735 (1963).
¶ 30 But I have come to conclude that this court has moved from an appropriate level of deference to the judgments of a coordinate branch of government, to a near total abdication of its constitutional responsibility to review legislative action. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is, emphatically, the province and duty of the judicial department, to say what the law is."). The referendum is a sword the people gave themselves to slay unwanted legislation. The people also gave the legislature a shield to protect certain legislation under certain circumstances from the referendum sword. It is ultimately and uniquely the judiciary's role to assure that both the sword and the shield are used only as constitutionally permitted.[1]
¶ 31 Whether or not a procedural change can be an emergency, or necessary for the support of government and its institutions, is not a question we should answer hurriedly, based on hastily filed briefs hastily read. As I noted recently,
there is little to commend judicial intervention into the electoral process before the process is complete. First, the necessary procedures of judicial decision making do not lend themselves to instant resolution of electoral issues. Our procedures are based upon a deliberative and adversarial process. Proper judicial decision making requires notice and an opportunity for interested parties to be meaningfully heard. At the trial level, we engage in discovery, evidentiary hearings, and make findings of fact and conclusions of law. At the appellate level, we must be thoughtful and deliberate both to ensure a just and correct result in the instant case and because our decisions set precedents for the future.
Wash. State Republican Party v. King County Div. of Records, Elections & Licensing Servs., 153 Wash.2d 220, 226-27, 103 P.3d 725 (2004) (Chambers, J., concurring). Instead, it should be subject to a searching and deliberative process.
¶ 32 I recognize that a writ of mandamus directing the secretary of state to place a measure on the ballot despite his judgment that it is unconstitutional is extraordinary. See Cedar County Comm. v. Munro, 134 Wash.2d 377, 380, 950 P.2d 446 (1998); Walker v. Munro, 124 Wash.2d 402, 407, 879 P.2d 920 (1994). However, I see no other way to grant meaningful and timely review of this question. Accordingly, I would provisionally grant the petition for writ, allow signature gathering to go forward, and leave the substantive question of whether this was in fact an emergency for another day.
¶ 33 I dissent.
J.M. JOHNSON, J. (dissenting).
¶ 34 I disagree with the majority's resolution of this case and conclude we issue a writ of mandamus directing the secretary of state to file this referendum. Indeed, it is a violation of law for the secretary to refuse to file this petition as he has no constitutional or statutory authority to make decisions of constitutional validity that are exclusively the province of this court. I would protect the people's constitutional right of referendum, while allowing later  and full and fairconsideration of the merits. Because the court allows the secretary of state and legislature to act in prior restraint of that right, and *310 does so through historically and constitutionally flawed analysis, I dissent.
¶ 35 The appropriate focus of that analysis should be our state's constitution, especially the 7th Amendment passed in 1912. We should, however, begin the analysis years before, with article I of our constitution, which states the fundamental premise as to the source of political power in Washington:
All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.
Const. art. I, § 1.
¶ 36 The 7th Amendment was ratified by Washington voters in 1912 to enforce the people's constitutionally inherent political power. Article II, section 1, as amended by the people, guarantees the preeminent power of initiative and referendum, and now delineates a sharing of legislative powers:
The legislative authority of the state of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the state of Washington, but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature.
Const. art. II, § 1.
¶ 37 This amendment to our constitution made clear that of the people's inherent political power ("all political power"); the people of Washington broadly "reserved" power to control the legislative process. The second such power is referendum[1]:
The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions.... [[2]]
Const. art. II, § 1(b).
¶ 38 What the majority refers to as an "emergency clause" actually is the last clause above, a narrow exception to the general constitutional rule that "any" law may be referred to the people. That narrow exception does not provide the secretary of state any power to refuse to file referenda. Indeed, our constitution is mandatory as relates to filing:
Referendum petitions against measures passed by the legislature shall be filed with the secretary of state not later than ninety days after the final adjournment of the session of the legislature which passed the measure on which the referendum is demanded.
Const. art. II, § 1(d).
¶ 39 Two things should be apparent from the text of the constitution in both quotes above. First, there is no reference to any "emergency clause," though there is a very narrow exception to the referendum power found in article II, section 1(b) (discussed infra). Second, the constitution gives the secretary of state no power to block the people's power of referendum through refusal to file a referendum.
¶ 40 The constitution does allow the secretary of state to refuse a referendum but only if the referendum is filed too late, i.e., after the constitutional 90 days. Otherwise, a petition "shall be filed." Nor is there any provision of statutory law that empowers the secretary of state to frustrate referenda by refusing or delaying filing.[3]
¶ 41 The only statute referring to the secretary of state's refusal to file a petition for referendum or initiative is RCW 29A.72.170. *311 That statute allows refusal to file only upon the grounds the petition is defective in form,[4] bears too few signatures, or that "the time within which the petition may be filed has expired." RCW 29A.72.170(3). This statute did not authorize the secretary of state to refuse here. No other statute provides authority to refuse a referendum, a power which is also denied by the constitution.
¶ 42 Within article II of the Washington constitution there is one exception to laws subject to referendum which states: "except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions...." Const. art. II, § 1(b).
¶ 43 Here, the secretary refused the referendum only because he accepted the legislative recital in section 7 that:
Sections 1 and 2 of this act are necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing public institutions, and take effect immediately.
Laws of 2005, ch. 72, § 7(1).
¶ 44 First, the legal decision as to whether such recital properly excepts a law from referendum is not delegated to the secretary. Rather, this constitutional determination is a judicial decision to be exclusively made by this court.
¶ 45 Further, this court has consistently held that exceptions to the general rule that the people can act through referendum are to be strictly construed. Hall v. Corp. of Catholic Archbishop of Seattle, 80 Wash.2d 797, 801, 498 P.2d 844 (1972).
We believe it is self-evident that, by the adoption of amendment 7, the people intended to mark a line between laws that might be emergent and those that clearly are not, reserving to themselves the right to pass upon legislative acts that affect public measures and policies; that they fixed a limit beyond which the legislature cannot go without doing violence to the will and voice of the people; that the legislature has no right to tack an emergency clause onto an act in order to prevent the people from exercising their right of referendum, unless that act is clearly within the exception set forth in the amendment.
State ex rel. Humiston v. Meyers, 61 Wash.2d 772, 776, 380 P.2d 735 (1963).
¶ 46 In Humiston, the court also ruled that the validity of the emergency clause was a judicial question.
The question before us is one of construction or interpretation of an act of the legislature and of a provision of the constitution; this is a judicial question.
61 Wash.2d at 777, 380 P.2d 735; see also Philip A. Trautman, Initiative and Referendum in Washington, 49 Wash. L. Rev. 55, 73 n.68 (1973).
¶ 47 The separation of powers requires that the question is exclusively judicial. Thus, the secretary, a member of the executive branch, has no constitutional power to determine that a referendum is unlawfulnor to exercise prior restraint on the people's right by refusing to accept a referendum petition.
¶ 48 Even in this court, any doubt about the referenda power must be resolved in favor of the people.
When, therefore, the question comes whether the legislature has a right to declare an emergency which will take away the right of referendum, the doubt, if there be any, should be resolved in favor of the reserved power of the people instead of in the admittedly unwarranted declaration of the legislature.
State ex rel. Brislawn v. Meath, 84 Wash. 302, 315, 147 P. 11 (1915). The court held that this is not a question of abuse of discretion but a de novo question of constitutionality. Id. at 314, 147 P. 11. The legislature could not bind this court in such a judicial question any more than it could on constitutionality.
"The said legislative declaration has no greater effect and is no more binding upon the court than if the legislature had declared that a certain measure is or is not constitutional." *312 Id. at 316, 147 P. 11 (quoting McClure v. Nye, 22 Cal.App. 248, 133 P. 1145 (1913)).
¶ 49 CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1997) and some prior cases grant some deference to the legislature's determination of facts supporting a declaration of necessity. That case dealt with the "peace, health or safety" clause rather than "support of state government." Still, the court held whether the law was excepted from referendum should be discerned from the face of the law or from judicially noticeable facts. Although the majority opinion accepts the arguments made by the secretary of state, which justify his blocking the referendum, the majority opinion cannot identify "facts" that support a conclusion that this act is "necessary for the ... support of the state government and its existing public institutions." Const. art. II, § 1(b).
¶ 50 The majority opinion also fails to critically consider the facts asserted, and in doing so defers to the legislature far more than justified by our precedent or constitutional text.
¶ 51 So considered, the legislation in this case fails the tests laid out in all our cases, including CLEAN. By any standard, it is "obviously false" that this legislation was "necessary for the ... support of the state government and its existing public institutions." Const. art. II, § 1(b).

I. The Nature of I-601's Budget Cap and Supermajority Requirement
¶ 52 Before beginning the referendum exception analysis, it is important to understand the two relevant provisions of I-601 affected by this legislation. The majority refers to "I-601" as shorthand for the supermajority requirement to raise taxes contained in that initiative, which was suspended by section 2 of this act. Laws of 2005, ch. 72, § 2.
¶ 53 I-601 also had a state budget spending cap and supporting formulas that were changed in sections 3-6 of this legislation. It will be further noted below that this part of I-601 (the spending cap) is the only section referred to in the legislature's intent. That section (section 1) does not even mention suspending the supermajority for tax increases, which is argued here as the "emergency."
¶ 54 Ironically, I-601 was itself adopted in 1992 by a majority of the people through an initiative, the "first power reserved by the people" by the 7th Amendment.
¶ 55 The suspended provision of I-601 provides that taxes may be raised only if approved by a two-thirds supermajority vote of legislators. In this respect, I-601 is a rule of legislative procedurea precondition to raising taxes.
¶ 56 This supermajority serves as a procedural check to balance the power of the majority party and force compromise, especially when raising taxes. The supermajority requirement doesn't mean that any specific legislation will pass or fail. Indeed, in the decade since the people passed I-601, prior legislatures have adopted budgets with the provision in place.

II. The Legislative Declaration Must Be Judicially Reviewed and Found "Obviously False"
¶ 57 Our leading recent case on the referendum is CLEAN. Chief Justice Alexander wrote the majority opinion in both CLEAN and Washington State Labor Council v. Reed, 149 Wash.2d 48, 65 P.3d 1203 (2003) (WSLC) and summarized the CLEAN framework in WSLC:
It is a judicial question whether a measure is, in fact, in support of an existing government institution when an emergency clause is challenged or when the legislature has not plainly indicated its intentions.
WSLC, 149 Wash.2d at 58, 65 P.3d 1203.
¶ 58 In this case, the secretary of state focused his argument on the "support of state government" exception to the referendum power. Thus, the majority does not address the "necessary for the immediate preservation of the public peace, health or safety" exception. No colorable argument is made that there was any immediate threat to the "public peace, health or safety" even though that provision was also recited rote by the 2005 legislature. The court should take notice of the fact the legislature included *313 an emergency declaration also based on "health and safety," with no justification, as further indication of legislative dissimulation here.
¶ 59 The majority, however, focuses on the "support of state government" exception and tries to fit the "facts" to this theory. In evaluating whether facts exist that support the legislature's declaration that the act is "necessary for the ... support of the state government and its existing public institution," the court has ruled that we must "`consider the question from what appears upon the face of the act, aided by the court's judicial knowledge.'" CLEAN, 130 Wash.2d at 807, 928 P.2d 1054 (quoting Humiston, 61 Wash.2d at 778, 380 P.2d 735). I do so below, to conclude this exception was not properly invoked.

A. The Face of this Act Shows No Emergency
¶ 60 Substitute Senate Bill (SSB) 6078 itself is devoid of any indication that it was "necessary for the ... support of the state government and its existing public institutions." This legislation is unlike any law this court has held within this exception (cases discussed further infra part II).
¶ 61 The act does not raise revenue.
¶ 62 The act does not appropriate state funds, as did most such cases.[5]
¶ 63 The act does not even purport to save the state money (as did one act upheld by this court).
¶ 64 The only provision on this act's face quoted by the majority is in the statement of intent. "[M]odifications to the state expenditure limit ... will better balance the needs of the citizens for essential government services." Majority at 306 (quoting SSB 6078, § 1).
¶ 65 This is hardly emergent and says nothing about supporting state government. Read in its entirety, but buried in a footnote by the majority, intent section 1 demonstrates only the legislature's intent to ensure that the long-term budget process "operates with stability and predictability" by amending the other part of I-601, the budget cap provision.
The legislature finds that the citizens of the state benefit from a state expenditure limit that ensures that the state budget operates with stability and predictability, while encouraging the establishment of budget priorities and a periodic review of state programs and the delivery of state services. A state expenditure limit can prevent budgeting crises that can occur because of increased spending levels during periods of revenue surplus followed by drastic reductions in state services in lean years. The citizens of the state are best served by an expenditure limit that keeps pace with the growth in the state's economy yet ensures budget discipline and taxpayer protection. For these reasons, the legislature finds that modifications to the state expenditure limit, after ten years of experience following the initial implementation of Initiative Measure No. 601, will recognize the economic productivity of the state's economy and better balance the needs of the citizens for essential government services with the obligation of the legislature for strict spending accountability and protection of its taxpayers.
Substitute S.B. 6078, 59th Leg., Reg. Sess. § 1 (Wash.2005). Note that the "emergency" section applied only to this section and section 2it did not apply to the sections changing the budget cap.
¶ 66 The majority fails to understand that the intent section quoted above applies to the rest of the bill, not to the suspension of I-601's two-thirds supermajority requirement of section 2 (a provision it did not reference). SSB 6078 does more than suspend the two-thirds supermajority requirement to raise taxes  it fundamentally changes the way the state expenditure limit is calculated, shifting the "fiscal growth factor" from one based on inflation and population change to one based on statewide personal income. See SSB *314 6078, § 4. These changes, however, were not deemed emergenteven by the 2005 legislature.
¶ 67 On its face intent section 1 justifies only the change in the expenditure limit. It neither addresses nor justifies the supermajority requirement.
¶ 68 Obviously, suspension of the two-thirds supermajority for taxes had no effect on the state expenditure limit. Thus, the intent section by its terms does not establish any emergency for suspension of I-601's two-thirds vote requirement to raise taxes, nor that such "supports state government."
¶ 69 Finally, by its own terms, SSB 6078's suspension of I-601 supermajority requirement only lasts two years (until June 30, 2007). Thus, the 2005 legislature essentially admits that suspension of the supermajority of I-601 is not necessary for all budgets. This is consistent with the historical record that a decade of state budgets has been passed by other legislatures with I-601 intact.

B. Judicially Noticed "Facts" Prove There is No Constitutional Emergency
¶ 70 Although we may defer to the legislature for fact finding, we have never abdicated our judicial role to allow the mere legislative insertion of an emergency clause to block referendum. State ex rel. Blakeslee v. Clausen, 85 Wash. 260, 270, 148 P. 28 (1915).
¶ 71 Here, some "facts" argued by respondents, such as the "fact" of a severe budget deficit, are certainly not capable of demonstration from a source of indisputable accuracy. No source for this claim was cited by respondents, and there were disputes over the size and scope of the budget deficit.
¶ 72 We may judicially note facts that demonstrate that the legislative assertion was "obviously false" or a "palpable attempt at dissimulation." In this regard, the court should first note that the revenue from existing taxes was projected to increase more than 7 percent before the budget was even submitted. This proves factually that a budget could have been passed within I-601's expenditure limit without raising taxes or making any budget cuts.[6]
¶ 73 The court should also note that Governor Gregoire's proposed budget included less than half the tax increase ultimately adopted by the legislature. See Office of the Governor, Proposed 2005-07 Budget and Policy Highlights, available at http://www.ofm .wa.gov/budget /highlights/ass ets/pdf/highlights. pdf. If deference is also afforded the executive branch, especially on budget matters, the revenue projections and the governor's budget both indicate that the legislature's declaration of necessity for "support of state government" was false.
¶ 74 It is also obvious that budgets can be balanced by reducing government expenditures rather than raising taxes. Since more than two months remained before the statutory time for passing a budget at the time of this act, we cannot conclude that it was immediately necessary to change the law to make it easier to raise taxes to pass a budget. Compromise and bipartisanship, which the supermajority requirement of I-601 promotes, *315 would allow another solution, as it has in years past.
¶ 75 Finally, the majority notes that four bills which increased taxes were passed by less than the two-thirds supermajority required under I-601. Majority at 14-15. However, as these bills were passed after I-601's requirements were suspended, the fact of their passage tells us nothing about what would have passed if I-601's protections had been in place. We cannot conclude that such changes were "necessary" to increase taxes, even assuming the majority's unproven assumption that increasing taxes was necessary to pass the budget.[7]
¶ 76 We should also note that some other taxes were actually decreased by the 2005 legislature, further eroding the credibility of the claim that increases were "necessary." (These included exemptions to state property and sales and use taxes and deductions to B & O taxes. See S. WAYS & MEANS COMM., 2005-07 OPERATING & CAPITAL BUDGET: HIGHLIGHTS, pp. 39-43 (Apr. 24, 2005), available at http://leap.leg .wa.gov/leap/Bu dget/Detail/200 5/ o0507highlightsswm.pdf.)
¶ 77 Strongly bearing on the likelihood of "dissimulation" by the 2005 legislature through use of rote emergency clauses, the court should also note that of over 500 bills passed in the 2005 legislative session, nearly 20 percent contained an identical emergency clause.[8]

III. A Procedural Requirement Relating to Votes to Raise Taxes Does Not "Support Government"
¶ 78 Judicially noting the "facts" including the State's revenue projections (up 7 percent without new taxes) and the governor's proposed budget (fewer tax increases) prove the 2005 legislature's claimed necessity for the elimination of I-601's supermajority requirement was "obviously false" or a "palpable attempt at dissimulation."
¶ 79 However, proof of this conclusion is not necessary if there are no facts that affirmatively support the legislative declaration. Having demonstrated that all the majority's judicially noticed facts do not provide any support for the proposition that changing a procedural rule relating to how bills raising taxes are passed is "necessary for the... support of the state government and its existing public institutions," all that is left is the bare legislative assertion. That is not enough:
We think it too clear to require argument that the legislature cannot defeat the constitutional right, reserved by the people in the introductory paragraph of amendment seven, ... by merely inserting in an act the statement ...:
"This act is necessary for the immediate preservation of the public peace, health and safety and for the immediate support of the state government and its existing public institutions and shall take effect immediately."
State ex rel. Kennedy v. Reeves, 22 Wash.2d 677, 681, 157 P.2d 721 (1945).
¶ 80 The only legislative acts this court has found "necessary for the ... support of the state government and its existing public institutions" are bills which directly appropriate funds, raise revenue, or provide savings to the State. See State ex rel. Humiston v. Meyers, 61 Wash.2d 772, 777 nn.4, 5, 380 P.2d 735 (1963); see also State ex rel. Brislawn v. Meath, 84 Wash. 302, 318, 147 P. 11 (1915); State ex rel. Blakeslee v. Clausen, 85 Wash. 260, 270, 148 P. 28 (1915); State ex rel. Reiter v. Hinkle, 161 Wash. 652, 657-58, 297 P. 1071 (1931); State ex rel. Satterthwaite v. Hinkle, 152 Wash. 221, 225, 277 P. 837 (1929); State ex rel. Burt v. Hutchinson, 173 Wash. 72, 75-76, 21 P.2d 514 (1933); State ex rel. Robinson v. Reeves, 17 Wash.2d 210, 217, 135 P.2d 75 (1943), overruled in part on other grounds by State ex rel. Hoppe v. Meyers, 58 Wash.2d 320, 363 P.2d 121 (1961); State ex rel. McLeod v. Reeves, 22 Wash.2d *316 672, 674-75,157 P.2d 718 (1945); Humiston, 61 Wash.2d at 778, 380 P.2d 735; Ballasiotes v. Gardner, 97 Wash.2d 191, 199, 642 P.2d 397 (1982); Farris v. Munro, 99 Wash.2d 326, 336, 662 P.2d 821 (1983); Andrews v. Munro, 102 Wash.2d 761, 765, 689 P.2d 399 (1984). Only a single instance of the latter (providing savings to balance the state budget) has been approved by this court. State ex rel. Pennock v. Coe, 42 Wash.2d 569, 257 P.2d 190 (1953).
¶ 81 In an early case of considerable importance because nearly contemporaneous with the 7th Amendment, this court defined the term "support" of state government:
When so considered, "support" includes appropriations for current expenses, maintenance, upkeep, continuation of existing functions, as well as appropriations for such new buildings and conveniences as may be necessary to meet the needs and requirements of the state in relation to its existing institutions.
In Webster's New International Dictionary the word "support" is given the following definitions: "To furnish with funds or means for maintenance; to maintain; to provide for. To enable to continue; to carry on."
Blakeslee, 85 Wash. at 270, 148 P. 28.
¶ 82 We should conclude that suspending I-601's supermajority procedural requirement to raise taxes does not "furnish funds or means for maintenance for state government," does not "maintain state government," does not "provide for state government," does not enable state government to continue, and does not carry on state government.
¶ 83 SSB 6078's declaration that suspending the supermajority requirement of I-601 was "necessary for the ... support of the state government and its existing public institutions" is obviously false. Because it is obviously false, section 7 of the bill does not operate to exempt the bill from the people's right of referendum under the constitution.
¶ 84 This court should issue a writ of mandamus ordering the secretary of state to accept petitioners' proposed referendum measure. We would thereby fulfill our constitutional role, protect the people's powers of referendum, and prospectively stop the secretary of state (and the legislature) from prior restraint of this important right under article II of our constitution.
¶ 85 I therefore dissent.
SANDERS, J., concurs.
NOTES
[1] Section 1 of SSB 6078 provides:

The legislature finds that the citizens of the state benefit from a state expenditure limit that ensures that the state budget operates with stability and predictability, while encouraging the establishment of budget priorities and a periodic review of state programs and the delivery of state services. A state expenditure limit can prevent budgeting crises that can occur because of increased spending levels during periods of revenue surplus followed by drastic reductions in state services in lean years. The citizens of the state are best served by an expenditure limit that keeps pace with the growth in the state's economy yet ensures budget discipline and taxpayer protection. For these reasons, the legislature finds that modifications to the state expenditure limit, after ten years of experience following the initial implementation of Initiative Measure No. 601, will recognize the economic productivity of the state's economy and better balance the needs of the citizens for essential government services with the obligation of the legislature for strict spending accountability and protection of its taxpayers.
[2] Article II, section 1(b) of the Washington State Constitution provides that bills are not subject to referendum when they are "necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions...."
[3] In our prior cases, we have repeatedly noted that "or" should have been included in article II, section 1(b) and was inadvertently omitted by the legislature; the provision should be interpreted to include "or." Wash. State Labor Council v. Reed, 149 Wash.2d 48, 57 n. 5, 65 P.3d 1203 (2003); see also Farris v. Munro, 99 Wash.2d 326, 335-36, 662 P.2d 821 (1983).
[1] Justice Madsen's concurrence, for example, openly prefers representative government through the legislature absent recognition that in our state "[a]ll political power is inherent in the people," Const. art I, § 1, and the people have chosen to "reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature." Const. art. II, § 1. Justice Madsen would also "prefer to allow the process to work as the founding fathers intended" notwithstanding those same founders provided a process to amend the constitutionand in fact did so through the Seventh Amendment ratified in 1911, which established the right of initiative and referendum. Whether or not the subject legislation, which itself amends an initiative passed by the people, is appropriate is indeed a "political dispute" subject to resolution first by the legislature and then by the people through referendum. Notwithstanding, Justice Madsen resolves the dispute in this court according to her preferences, whereas I would protect the right of the people to resolve the dispute in accordance with theirs.
[2] Where the legislature uses an emergency clause simply to avoid a referendum rather than respond in good faith to a true "emergency" as defined by Washington Constitution article II, section 1(b); where the secretary of state declines to discharge a clear ministerial duty; and where the court essentially delegates its independent role as a constitutional guardian to the legislative branch of government in its power struggle against the popular branch of government; I find little left of the people's right of referendum.
[3] Chief Justice Alexander in his concurring opinion states this is "simply not material" given the majority's view that this bill is not subject to referendum. However, the chief justice overlooks that this legal determination is for the court, not the secretary of state; and this proceeding is for a writ of mandamus to force the secretary of state to perform his clear ministerial duty, i.e., allow the petition to circulate. Therefore fulfillment of that duty, given the extremely foreshortened 90-day time frame, is as material here as in any case. By refusing to enforce that duty here the majority invites repetition of the secretary of state's conduct in all future casesregardless of the legal merit of the "emergency." Given the majority's view on the merits, one might conclude that the secretary's refusal to discharge his ministerial duty in this case is harmless; however, it is error nevertheless.
[1] I respectfully disagree with Justice Sanders' characterization of the legislature, the members of the majority, and the honorable secretary of state. It is my opinion that the members of the majority and the secretary of state are making their best efforts to abide by their statutory and constitutional obligations.
[1] The first is initiative: article II, section 1(a).
[2] By later Amendment 30, the people reduced the number of signatures for referendum from 6 percent to 4 percent of the statewide vote, obviously intending to further empower the people.
[3] Article II of the Washington constitution and Amendment 7 are further protective of the people's powers, by restricting the legislature to adoption of "legislation ... to facilitate its operation." Const. art. II, § 1(d). Legislation allowing the secretary of state to impede referenda would fail this test.
[4] E.g., not identifying the act referred, not including a statutory warning to voters.
[5] Indeed, the historical justification for Washington, including the exception within the 7th Amendment, was Oregon's experience with a referendum provision with no such exception. An appropriation act for the state university was blocked by that state's first referendum. See State ex rel. Blakeslee v. Clausen, 85 Wash. 260, 267, 148 P. 28 (1915).
[6] See below source
2003-05 Biennium Budget (with 601 limit) $23.475.7 b A
2005-07 Projected Revenue (no tax increases) $24.885.3 b B
Budget increase percentage (no tax increase) 7.05 % (calculated)
2003-05 Ending Fund Balance $ 835.6 m B
_________________________________________________________
Total 2005-07 Resources (no tax increase): $25.720.9 b
Source A:
Expenditure Limit Committee Rep. at 14 (Nov. 18, 2004), available at
http://www.elc.wa. gov/sub/2004/2004 ppt.pdf
Source B:
Vol. XXVIII, No. 1 Washington Economic and Revenue Forecast at 3, 65 (Mar.2005) (prepared by
Economic and Review Forecast Council), available at http://www.erfc.wa.gov

[7] See supra note 5 (revenues under existing taxes would increase approximately 7 percent). Revenue raised by the increased taxes ($480 million) was double what the governor asked and less than 2 percent of the adopted $26 billion 05-07 budget.
[8] Examples of other bills with "emergency" clauses clearly not complying with the constitutional requirements are cited in the briefs.